## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOE MANIS,<br><br>            Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF AGRICULTURE;<br>THOMAS JAMES VILSACK, in his official<br>capacity as the Secretary of Agriculture;<br>MICHAEL WATSON, in his official capacity<br>as Administrator of the Animal and Plant<br>Health Inspection Service,<br><br>            Defendants. | No. _____ |

## COMPLAINT

1.      Joe Manis is a retired North Carolina businessman who has been involved with Tennessee Walking Horses for the last 50 years, active in the North Carolina Walking Horse Association ("NCWHA") for the last 30 years, and who owns walking horses, one of which is regularly shown in competitions across the southeast.

2.      Mr. Manis has been accused by the United States Department of Agriculture ("USDA") of allowing the entry into a Virginia walking horse competition of a horse he owns that allegedly had been "sored"—a violation of the Horse Protection Act ("HPA") for which USDA can impose significant fines and a ban from the industry.

3.      Mr. Manis faces what is effectively a USDA prosecution for this alleged HPA violation in USDA's in-house adjudication scheme. That scheme suffers from fundamental structural constitutional defects: The final decision-making authority for USDA is the

1

USDA Judicial Officer, a mere employee who exercises his authority in violation of the Appointments Clause; its administrative law judges ("ALJ") are not properly supervised and are unconstitutionally shielded from removal by two layers of tenure protection; and the adjudication process denies Mr. Manis his right to a jury trial in an Article III court.

4.    The hearing in Mr. Manis's adjudication is currently scheduled for the week of April 29, 2024, and the administrative law judge has refused to stay the case. USDA must be preliminarily and permanently enjoined from enforcing the HPA against Mr. Manis through USDA's unconstitutional adjudication process, outside of an Article III court.

## THE PARTIES

5.    Plaintiff Joe Manis is an individual who resides in the state of North Carolina.

6.    Defendant United States Department of Agriculture is an executive agency of the United States government headquartered in Washington, DC.

7.    Defendant Thomas James Vilsack is the Secretary of Agriculture and is being sued in his official capacity.

8.    Defendant Michael Watson is the Administrator of the Animal and Plant Health Inspection Service ("APHIS") and is being sued in his official capacity.

## JURISDICTION AND VENUE

9.    Jurisdiction is proper under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

10.    District court jurisdiction is also proper under 15 U.S.C. § 1825(d)(6) of the Horse Protection Act.

2

11.     Plaintiff's claims for declaratory and injunctive relief are authorized by the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201–02), Federal Rules of Civil Procedure 57 and 65, and by the legal and equitable powers of this Court.

12.     Venue is proper in the Middle District of North Carolina under 28 U.S.C. § 1391(e) because Mr. Manis is a resident of Laurinburg, North Carolina, which is within this judicial district, and defendants include United States agencies and officers sued in their official capacities.

## BACKGROUND

### *Mr. Manis's Walking Horse Career*

13.     Mr. Manis is a retired business owner who lives in North Carolina and spends his time caring for the farm that he owns.

14.     Mr. Manis also owns several Tennessee Walking Horses.

15.     Gaited horse breeds, like Tennessee Walking Horses, have long been admired for their elegant, high-stepping gait that comes from both careful breeding and careful training.

16.     Tennessee Walking Horses perform three distinct gaits: the flat-foot walk, running walk, and canter.

17.     Horse owners and trainers show the breed in competitions across the southeast United States, and the riders win some prize money.

18.     Mr. Manis regularly shows in competitions one walking horse that he owns.

3

19. Mr. Manis does not train the horses himself, but hires a trainer to prepare the horses for competitions.

20. Mr. Manis has been recognized for the achievements of his horses, which have been frequently featured in walking horse publications.

21. Mr. Manis is also active in the NCWHA.

22. Mr. Manis has enjoyed high visibility in walking horse associations at the state level. He has many times served as the president of the NCWHA, and has served in virtually every position within that association at some time.

23. Mr. Manis and his horses have been rewarded with state and national high point and other awards, resulting in great publicity.

24. In 2023, Mr. Manis served as the 2nd Vice President of NCWHA.

25. In January 2024, Mr. Manis for the second time received the NCWHA Senior Horse Person award, given to recognize participants who best epitomize sportsmanship, success, and contributions to the good of the walking horse breed.

### The Horse Protection Act

26. The distinctive gait of the Tennessee Walking Horse comes, in part, from time- and labor-intensive training.

27. But abusive trainers have discovered that they can enhance the sought-after gait by inflicting pain on the horse's pasterns or legs through a practice called "soring."

28. In 1970, Congress passed the HPA in an effort to end the "unfair[]" practice of horse soring. 15 U.S.C. § 1821 *et seq*.

4

29.     The HPA defines soring as the practice of applying "irritating or blistering agent[s]," inflicting "burn[s], cut[s], or laceration[s]," inserting "any tack, nail, screw, or chemical agent," or the use of "any other substance[s] or device[s]" on the limb of a horse that cause "or can reasonably be expected" to cause "physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving." 15 U.S.C. § 1821(3).

30.     The HPA prohibits, among other things, horse owners from allowing the entry of a sore horse they own in any horse show or exhibition "for the purpose of showing or exhibiting." 15 U.S.C. § 1824(2).

31.     Congress amended the HPA in 1976 to increase the civil monetary penalty for violations of the statute and to allow the Secretary to disqualify violators from "showing or exhibiting any horse, judging or managing any horse show, horse exhibition, or horse sale, or auction." 15 U.S.C. § 1825(b) and (c).

32.     Both monetary and injunctive penalties can be imposed only after "notice and opportunity for hearing before the Secretary." *Id.*

33.     Each violation of the HPA carries a maximum civil monetary penalty of $2,000. 15 U.S.C. § 1825(b)(1).

34.     Disqualifications from showing or exhibiting horses imposed by the Secretary must be "not less than one year for the first violation and not less than five years for any subsequent violation" and can be imposed only on those also ordered to pay a civil monetary penalty. 15 U.S.C. § 1825(c).

5

35.     Violations of the HPA can also carry criminal penalties. 15 U.S.C. § 1825(a).

36.     The Secretary delegated administration and civil enforcement of the HPA to APHIS. *See, e.g.*, 9 C.F.R. § 11.4.

37.     Horse show and exhibit management participate in the enforcement of the HPA by appointing individuals to inspect competing horses. Representatives of the Secretary also conduct inspections. In all events, inspectors follow regulations prescribed by the Secretary. 15 U.S.C. § 1823(c) and (e); 9 C.F.R. §§ 11.4 and 11.7.

38.     Horse show management may appoint Designated Qualified Persons ("DQPs")—who are trained and licensed by horse industry organizations or associations ("HIO") through programs monitored by APHIS—as inspectors at events to monitor for sore horses. 9 C.F.R. § 11.7(a) and (b).

39.     Virtually all recognized horse shows, including the show at issue in this Complaint, now employ DQPs through the HIO system, thereby ensuring that sore horses are not allowed to show, and insulating show managers from potential liability under the HPA.

40.     If the DQP finds a horse to be noncompliant with the HPA, the violation must be reported to management or event sponsors, who must disqualify the horse from entry into the event. 9 C.F.R. § 11.20(b).

41.     USDA can initiate enforcement proceedings for any violation of the HPA identified by a DQP or, in fact, in spite of a finding of compliance on the part of the DQP. 9 C.F.R. § 11.25(f).

### *USDA's home-field advantage: in-house adjudication for HPA claims*

42.     USDA enforces the HPA through its in-house adjudication process under the Uniform Rules of Practice for the Department of Agriculture. 9 C.F.R. § 12.1.

43.     The HPA requires that the Secretary conduct hearings to assess civil penalties or disqualify violators. 15 U.S.C. § 1825(b) and (c).

44.     Yet the Secretary does not do so. Under a statute predating the HPA, the Secretary may delegate "the whole or any part of any regulatory function" to any self-designated officer or employee. 7 U.S.C. § 2204-2.

45.     Pursuant to 7 U.S.C. § 2204-2, the Secretary delegated his authority to impose civil penalties for violations of the HPA to USDA's Judicial Officer, a position created by the Secretary. 7 C.F.R. § 2.35; *see also*, *e.g.*, 10 Fed. Reg. 13,769 (Nov. 9, 1945).

46.     Before an HPA case reaches the Judicial Officer, it must proceed through USDA's administrative hearing process. 7 C.F.R. §§ 1.131, 1.133.

47.     ALJs make the initial decision in each adjudication. 7 C.F.R. § 2.27(a)(1).

48.     The current USDA ALJs—including Judge Jill S. Clifton who is overseeing the adjudication of the claim against Mr. Manis—were appointed by the Secretary.

49.     USDA ALJs enjoy two layers of protection from removal by the President.

50.     USDA ALJs are appointed under 5 U.S.C. § 3105 and can be removed "only for good cause established and determined by the Merit Systems Protection Board" ("MSPB"). 5 U.S.C. § 7521(a).

51.    MSPB members may "be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

52.    USDA ALJs are empowered to rule upon motions and requests, conduct conferences and hearings, administer oaths and affirmations, issue subpoenas, hear oral argument on facts or law, and take other significant actions during the course of the administrative hearing. 7 C.F.R. § 1.144(c).

53.    At the conclusion of the adjudication, USDA ALJs issue an initial decision that "become[s] final without further proceedings unless there is an appeal to the Secretary." 7 C.F.R. § 2.27; 5 U.S.C. § 557.

54.    An ALJ's decision must be appealed (if at all) to the Judicial Officer—not the Secretary. *See* 7 C.F.R. § 1.145(a).

55.    In an appeal of an initial decision by an ALJ, the Judicial Officer reviews the parties' briefs, presides over oral argument, and issues a final decision for the Department. 7 C.F.R. §§ 1.145, 2.35(a).

56.    The Judicial Officer exercises the final decision-making power of USDA in the adjudication. 7 C.F.R. § 2.35.

57.    The Judicial Officer does not hold any office created by law.

58.    The Judicial Officer was not appointed by the President.

59.    The Judicial Officer was not confirmed by the Senate.

60.    Only decisions of the Judicial Officer are "final for purposes of judicial review." 7 C.F.R. §§ 1.139, 1.142(c)(4), 1.145(i).

8

61. No statute or regulation permits the Secretary to affirm, reverse, or otherwise review the decision of the Judicial Officer.

62. Delegations of authority by the Secretary to the Judicial Officer "shall be construed as … vested by law" in the Judicial Officer, not the Secretary. 7 U.S.C. § 2204-3; *see* 7 C.F.R § 2.35(a).

63. And the Secretary cannot retroactively revoke a delegation of authority. 7 U.S.C. § 2204-3.

64. As a result, the Secretary is prohibited from reviewing, affirming, modifying, or reversing the Judicial Officer's decision after it is made.

65. Persons found to have violated the HPA may obtain judicial review of the Judicial Officer's final order from a United States Court of Appeals "for the circuit in which such person resides or has his principal place of business or in the United States Court of Appeals for the District of Columbia Circuit." 15 U.S.C. § 1825(b)(2).

66. In sum, an employee of USDA (the Judicial Officer)—who holds no office created by Congress—exercises the final decision-making authority in USDA's adjudications through nothing more than a delegation by the Secretary and without any principal-officer supervision.

67. The Judicial Officer functions as a principal officer but is not appointed by the President and confirmed by the Senate as required by the Appointments Clause of the U.S. Constitution, art. II, § 2, cl. 2.

9

*USDA's pending allegations against Mr. Manis*

68.     On May 19, 2023, APHIS filed a complaint against Mr. Manis (HPA Docket No. 23-J-0044) alleging that he violated the HPA by allowing the entry of a horse he owned into a Virginia horse show while the horse was allegedly sore.

69.     While APHIS alleges that the horse was sore, it does not allege that Mr. Manis sored the horse, caused the horse to become sore, or otherwise abused the horse. In fact, APHIS does not allege who sored the horse.

70.     Mr. Manis denied the allegation.

71.     On February, 21, 2024, Judge Clifton proposed scheduling the hearing in HPA Docket No. 23-J-0044 for the week of April 22, 2024, and USDA represented it is available for the hearing that week.

72.     On February 22, 2024, Mr. Manis moved to dismiss on the grounds that the USDA's internal adjudication process is unconstitutionally structured for the following reasons:

    a.    USDA's Judicial Officer unlawfully enters final decisions for USDA either as an employee or an improperly appointed officer in violation of the Appointments Clause;

    b.    USDA ALJs are improperly supervised by the Judicial Officer in violation of the Appointments Clause;

    c.    USDA ALJs are unconstitutionally shielded from removal by two layers of tenure protection;

10

d.     USDA's internal adjudication process violates the Seventh Amendment's guarantee of a jury trial for suits at common law; and

e.     USDA's internal adjudication process violates Article III's requirement that suits involving private rights be heard in an Article III court.

73.     As of this filing, USDA has not responded to Mr. Manis's motion to dismiss.

74.     On February 27, 2024, Mr. Manis requested that no hearing be scheduled at this time given his motion to dismiss and the anticipated filing of this Complaint.

75.     On February 28, 2024, USDA generally opposed a stay of the case and Judge Clifton notified the parties that she would not stay the case.

76.     In light of Judge Clifton's refusal to enter a stay, Mr. Manis indicated his availability for a hearing the week of April 29, 2024.

77.     On February 29, 2024, both Judge Clifton and USDA stated they are available for the hearing the week of April 29, 2024, and Judge Clifton asked the parties to propose specific days that week to reserve for the hearing.

### *Mr. Manis faces an unconstitutional hearing*

78.     As of now, APHIS's allegation against Mr. Manis will be adjudicated in an internal USDA hearing before Judge Clifton the week of April 29, 2024.

79.     Employees at APHIS—an arm of the USDA—and the USDA General Counsel's office are prosecuting Mr. Manis's case.

80.     Judge Clifton—an officer of the USDA—is hearing Mr. Manis's case, and in the absence of any intervention, will be compiling a record, and issuing a recommended decision.

81.     The Judicial Officer—a USDA employee acting pursuant to authority delegated by the Secretary—oversees the procedure and will enter any final decision on behalf of USDA. The Judicial Officer is empowered to completely overrule a recommended decision in favor of the respondent and historically has done so many times.

82.     Judge Clifton's appointment as an ALJ for USDA was ratified by the Secretary on July 24, 2017. *See In Re: Philip Trimble*, 77 Agric. Dec. 15, 17 (U.S.D.A. June 8, 2018).

83.     The prosecutor and adjudicators of the allegations against Mr. Manis are representatives of the same agency.

84.     Through its in-house adjudication, the USDA seeks to impose a civil monetary penalty and disqualification from competition against Mr. Manis. 15 U.S.C. § 1825(b) and (c).

85.     Through its in-house adjudication process, USDA seeks to deprive Mr. Manis of his private rights to retain his property (his money) and participate in walking horse competitions, and to litigate allegations that involve the private rights of the horse shows and Mr. Manis's fellow horse-show competitors.

86.     USDA's internal adjudication process deprives Mr. Manis of a fair hearing overseen by a neutral arbiter.

87.     USDA's internal adjudication process subjects Mr. Manis to a hearing overseen by officials who are not accountable to the President—and to the People.

88.     The pending allegation against Mr. Manis is effectively a suit at common law with a legal remedy for which he is entitled to a jury trial that is not available in the USDA adjudication process.

89.     USDA's in-house adjudication process imposes a here-and-now constitutional injury on Mr. Manis—namely, (1) the absence of a principal officer to issue a final decision in the case and supervise the inferior officer ALJs, (2) the lack of ALJs properly accountable to the President, (3) the absence of a jury as required by the Seventh Amendment, and (4) the unlawful attempt to adjudicate private rights outside of an Article III court.

### *Mr. Manis's claims belong in federal court now*

90.     In *Axon Enterprise, Inc. v. Federal Trade Commission*, 143 S.Ct. 890, 897, 905 (2023), the Supreme Court held that parties bringing "structural" or "fundamental" challenges to an agency in-house adjudication—as Mr. Manis is here—must receive a remedy before the hearing.

91.     Claims of unconstitutionally structured administrative adjudications can be reviewed by federal district courts where they are "collateral to any decisions the [agency] could make in individual enforcement proceedings" and "they fall outside the [agency's] sphere of expertise." *Axon*, 143 S.Ct. at 906.

Case 1:24-cv-00175-WO-JLW   Document 1   Filed 03/01/24   Page 13 of 26

92.     Like in *Axon*, Mr. Manis is being subjected to an unconstitutional adjudication process that deprives Mr. Manis of his right not to undergo such a process regardless of the outcome. *See id.* at 903–04.

93.     *Axon* requires that this Court enjoin the unconstitutional process.

\* \* \*

94.     In sum, USDA's enforcement scheme subjects Mr. Manis to an unconstitutional hearing, (1) without a jury as required by the Seventh Amendment, (2) in violation of Article III of the Constitution, (3) before an ALJ, who is improperly supervised, and whose dual-layer tenure protection violates the separation of powers, and (4) whose decision can only be appealed to a Judicial Officer who is improperly wielding principal-officer power.

95.     Mr. Manis faces a here-and-now injury of being subjected to the ongoing unconstitutional adjudication process on the pending allegation against him.

96.     It is impossible to remedy this injury once the adjudication process is complete.

97.     Mr. Manis's constitutional challenges are irrelevant to the merits of the allegation against him.

98.     The resolution of Mr. Manis's constitutional challenges is outside the ability of USDA.

99.     Only a federal district court can provide Mr. Manis with the relief he is seeking from an unconstitutionally structured USDA adjudication process.

## COUNT I: The Judicial Officer Unconstitutionally Exercises
## Principal Officer Power

### (Article II, Section 2, Clause 2, of the U.S. Constitution)

100.    Mr. Manis restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

101.    The Judicial Officer unconstitutionally exercises principal officer power because he is neither appointed as a principal officer nor holds an office created "by Law." U.S. CONST. art. II, § 2, cl. 2.

102.    "Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch." *United States v. Arthrex*, 141 S.Ct. 1970, 1985 (2021).

103.    The Secretary delegated to the Judicial Officer the power to make all final decisions for USDA in adjudications under the HPA as if the Judicial Officer was the Secretary. *See* 7 U.S.C. § 2204-3; 7 C.F.R. §§ 1.145, 2.35.

104.    Decisions of the Judicial Officer are "final for purposes of judicial review." 7 C.F.R. §§ 1.139, 1.142(c)(4).

105.    Delegations of authority by the Secretary to the Judicial Officer "shall be construed as … vested by law" in the Judicial Officer, not the Secretary. 7 U.S.C. § 2204-3; *see* 7 C.F.R § 2.35(a).

106.    When the Secretary delegated final decision-making authority in USDA adjudications to the Judicial Officer, the Secretary was divested of that same power, and

15

the Judicial Officer issues final decisions as if he were the Secretary. *See* 7 U.S.C. § 2204-3.

107.    The Secretary cannot retroactively revoke his delegations to the Judicial Officer. 7 U.S.C. § 2204-3.

108.    The Secretary cannot review final decisions of the Judicial Officer.

109.    The Judicial Officer functions as a principal officer.

110.    Principal officers of the United States must be appointed by the President "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2, cl. 2.

111.    The Judicial Officer is not appointed by the President.

112.    The Judicial Officer is not confirmed by the Senate.

113.    The Judicial Officer is not properly appointed as a principal officer of the United States under the Appointments Clause. *See* U.S. CONST. art. II, § 2, cl. 2.

114.    Even if the Judicial Officer functions as an inferior officer, he unconstitutionally exercises that power because he does not hold a statutorily created office.

115.    All officers of the United States must occupy a "continuing office established by law," meaning "created by statute, down to [the officer's] 'duties, salary and means of appointment.'" *Lucia v. SEC*, 138 S.Ct. 2044, 2053 (2018).

116.    The position of Judicial Officer was created by the Secretary through regulations, not by any statute. 7 C.F.R. § 1.132.

16

117.     The Judicial Officer holds only authority delegated to him by the Secretary; he does not hold an office created by law. *See* 7 C.F.R. § 2.35(a).

118.     Additionally, Congress has not provided for an alternate appointment of the Judicial Officer by a head of department as the Appointments Clause requires for inferior officers not to be appointed by the President and confirmed by the Senate. U.S. CONST. art. II, § 2, cl. 2.

119.     The Judicial Officer was selected for his position by the Secretary, not appointed by the President with Senate confirmation.

120.     The Judicial Officer's status as either an employee or an improperly appointed officer of the United States leaves USDA ALJs without the constitutionally requisite principal officer supervision.

121.     USDA ALJs, including Judge Clifton, were appointed by the Secretary as inferior officers.

122.     USDA ALJs hold offices created by law as required by the Appointments Clause. *See* 5 U.S.C. § 3105.

123.     Inferior officers must exercise their power under the supervision of a properly appointed principal officer. *Arthrex*, 141 S.Ct. at 1980.

124.     In agency adjudications, principal officer supervision must include the ability to review the decisions of an inferior officer.

125.     Initial decisions of ALJs in HPA adjudications are appealable only to USDA's Judicial Officer, who issues final decisions for USDA. 7 C.F.R. § 1.145(a).

17

126. The decisions of USDA ALJs are not subject to review by any principal officer.

127. USDA ALJs lack principal officer supervision, which is unconstitutional.

## COUNT II: USDA ALJs' Dual-Layer Tenure Protection Contravenes the U.S. Constitution's Separation of Powers

### (Article II, Section 3, of the U.S. Constitution)

128. Mr. Manis restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

129. The Constitution requires that the President "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

130. The President's ability to remove executive officers is central to the President's executive power and his responsibility to take care that the laws are faithfully executed. *Free Enter. Fund. v. PCAOB*, 561 U.S. 477, 492–93 (2010).

131. USDA ALJs are officers of the United States subject to the Appointments Clause.

132. USDA ALJs enjoy two layers of tenure protection from removal by the President.

133. USDA ALJs—including Judge Clifton—are appointed under 5 U.S.C. § 3105.

134. ALJs' appointed under 5 U.S.C. § 3105 can be removed "only for good cause established and determined by the Merit Systems Protection Board." 5 U.S.C. § 7521(a).

135. USDA ALJs cannot be removed by the Secretary.

18

136. Members of the MSPB can be "removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

137. The MSPB is an independent agency that is not part of USDA.

138. Multi-level protection from removal of an inferior officer violates "Article II's vesting of the executive power in the President" because it prevents the President from "'tak[ing] Care that the Laws be faithfully executed.'" *Free Enter. Fund*, 561 U.S. at 484.

139. Judge Clifton is unconstitutionally protected from removal by the President.

140. The for-cause removal protections for ALJs are not severable because they are "a central part" of Congress's "overall scheme" of substantially independent agency adjudicators. *Lucia*, 138 S.Ct. at 2060 (Breyer, J., concurring in part and dissenting in part).

141. Severing the ALJ for-cause removal protections also would not resolve the Secretary's inability to remove an ALJ.

### COUNT III: USDA's In-House Adjudication Violates the Seventh Amendment Jury Trial Right

**(Seventh Amendment of the U.S. Constitution)**

142. Mr. Manis restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

143. The Seventh Amendment to the Constitution provides: "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII.

144. "[T]he Seventh Amendment [] applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law

19

courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989).

145.   APHIS's claim against Mr. Manis is analogous to a common law tort claim—it creates a legal duty for horse owners not to allow the entry of sore horses in horse shows.

146.   More specifically, APHIS's claim against Mr. Manis is analogous to common-law fraud and breach of contract claims.

147.   Mr. Manis is effectively accused of violating the rules he agreed to follow when he allegedly allowed his horse to be entered into the Virginia walking horse competition.

148.   The Seventh Amendment applies when the government seeks legal remedies, such as monetary damages or civil monetary penalties.

149.   *Any* claims in federal court that seek legal remedies such as civil monetary penalties require a jury trial. *Tull v. United States*, 481 U.S. 412, 418–23 (1987).

150.   The HPA empowers APHIS to seek and collect civil monetary penalties—a legal remedy—through USDA's in-house adjudication process. 15 U.S.C. § 1825(b).

151.   The allegation against Mr. Manis cannot be assigned by Congress to USDA for resolution because it does not involve a public right.

152.   The HPA assigns to USDA private right claims of fraud and breach of contract that Mr. Manis's fellow competitors and the horse show could bring against him to redress the unfair practice in which APHIS alleges he engaged.

20

153. Neither of these types of claims are "matter[s] that can be pursued only by grace of the other branches." *Stern v. Marshall*, 564 U.S. 462, 493 (2011).

154. Mr. Manis has a private right in his property in the form of the civil monetary penalties USDA is attempting to extract from him.

155. USDA can also disqualify Mr. Manis "from showing or exhibiting any horse, judging or managing any horse show, horse exhibition, or horse sale or auction for a period of not less than one year for the first violation and not less than five years for any subsequent violation." 15 U.S.C. § 1825(c).

156. Mr. Manis has a private right in his lawful business activities, which USDA can take away from him through a disqualification order.

157. USDA's in-house adjudication process does not involve an "'expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by [USDA].'" *Stern*, 564 U.S. at 494.

158. USDA administrative adjudication under many of the statutes enforced by USDA can be heard by an ALJ. 7 C.F.R. § 2.27.

159. Appeals from initial decisions of USDA ALJs in adjudicatory proceedings covered by the APA, among others, go to the Judicial Officer. 7 C.F.R. § 2.35(a).

160. USDA has a uniform set of rules governing the adjudication of claims under 38 statutes in addition to the HPA. 7 C.F.R. § 1.131.

161. The USDA's in-house adjudication process does not include a jury trial.

162.    The USDA's in-house adjudication process denies Mr. Manis his Seventh Amendment right to a jury trial.

## COUNT IV: USDA's In-House Adjudication Process Violates Article III

### (Article III of the U.S. Constitution)

163.    Mr. Manis restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

164.    The Constitution vests the "judicial Power of the United States ... in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1.

165.    The judicial power "extend[s] to all Cases, in Law and Equity, arising under ... the Laws of the United States." U.S. CONST. art. III, § 2, cl. 1.

166.    The Constitution does not vest the judicial power of the United States in the executive branch.

167.    USDA cannot wield the "judicial Power" of the United States.

168.    The judicial power to decide cases "in Law" extends to all claims that are also "Suits at common law" under the Seventh Amendment.

169.    The adjudication of private rights disputes is the core of the judicial power.

170.    The same private rights analysis for the availability of a jury trial under the Seventh Amendment is applicable to whether Congress can "assign adjudication of that cause of action to a non-Article III tribunal." *Granfinanciera*, 492 U.S. at 53.

171. If a statutory claim ultimately adjudicates a private right, it must be adjudicated by an Article III court.

172. USDA's in-house adjudication process for alleged HPA violations adjudicates private rights.

173. The HPA effectively codifies private right claims for fraud and breach of contract that Mr. Manis's fellow competitors and the competition could bring against him to redress the unfair practice in which he is alleged to have engaged.

174. Neither of these claims are "matter[s] that can be pursued only by grace of the other branches." *Stern*, 564 U.S. at 493.

175. USDA can impose civil money penalties against Mr. Manis if he is found to have violated the HPA. 15 U.S.C. § 1825(b)(1).

176. Mr. Manis has a private right in his property in the form of the civil monetary penalties USDA is attempting to extract from him.

177. USDA can also disqualify Mr. Manis "from showing or exhibiting any horse, judging or managing any horse show, horse exhibition, or horse sale or auction for a period of not less than one year for the first violation and not less than five years for any subsequent violation." 15 U.S.C. § 1825(c).

178. Mr. Manis has a private right in his lawful business activities, which USDA can take away from him through a disqualification order.

23

179.    USDA's in-house adjudication process does not involve any "'expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by [USDA].'" *Stern*, 564 U.S. at 494.

180.    USDA administrative adjudication under many of the statutes enforced by USDA can be heard by an ALJ. 7 C.F.R. § 2.27.

181.    Appeals from initial decisions of USDA ALJs in adjudicatory proceedings covered by the APA, among others, go to the Judicial Officer. 7 C.F.R. § 2.35(a).

182.    USDA has a uniform set of rules governing the adjudication of claims under 38 statutes in addition to the HPA. 7 C.F.R. § 1.131.

183.    USDA is neither an Article III court nor an Article III agency.

184.    No Article III judge oversees hearings through the USDA in-house adjudication process.

185.    It is unconstitutional for the claim against Mr. Manis to be adjudicated outside of an Article III court.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court issue:

186.    A judgment pursuant to 28 U.S.C. § 2201 declaring that the Secretary's delegation of final decision-making authority in USDA adjudications to the Judicial Officer violates the United States Constitution's Appointments Clause, art. II, § 2, cl. 2; and a permanent injunction of the pending administrative enforcement proceeding against Mr. Manis (HPA Docket No. 23-J-0044).

24

187. A judgment pursuant to 28 U.S.C. § 2201 declaring that USDA's ALJs are unconstitutionally supervised in violation of the United States Constitution's Appointments Clause, art. II, § 2, cl. 2; and a permanent injunction of the pending administrative enforcement proceeding against Mr. Manis (HPA Docket No. 23-J-0044).

188. A judgment pursuant to 28 U.S.C. § 2201, declaring USDA's dual-layer tenure protection violates the United States Constitution's separation of powers in Article II; and a permanent injunction of the pending administrative enforcement proceeding against Mr. Manis (HPA Docket No. 23-J-0044).

189. A judgment pursuant to 28 U.S.C. § 2201, that the USDA's administrative enforcement scheme violates the United States Constitution's Seventh Amendment right to a jury trial; and a permanent injunction of the pending administrative enforcement proceeding against Mr. Manis (HPA Docket No. 23-J-0044).

190. A judgment pursuant to 28 U.S.C. § 2201, that the USDA's administrative enforcement scheme violates Article III of the United States Constitution; and a permanent injunction of the pending administrative enforcement proceeding against Mr. Manis (HPA Docket No. 23-J-0044).

191. A preliminary and permanent injunction prohibiting USDA from enforcing the HPA against Mr. Manis in HPA Docket No. 23-J-0044 through USDA's current administrative enforcement scheme.

192. A preliminary and permanent injunction prohibiting USDA from enforcing the HPA against Mr. Manis in HPA Docket No. 23-J-0044 outside of an Article III court.

193.    An award of reasonable attorney fees and costs, pursuant to 28 U.S.C.

§ 2412, or any other applicable authority.

194.    Such other relief as the Court finds just and proper.

DATED: March 1, 2024.

Respectfully submitted,

s/ Thomas B. Kakassy
THOMAS B. KAKASSY
North Carolina Bar No. 9297
P.O. Box 2436
Gastonia, NC 28053
Telephone: (704) 867-1795
Fax: (704) 867-1820
Tom@kakassylaw.com

JOSHUA M. ROBBINS*
Virginia Bar No. 91020
ALLISON D. DANIEL*
Ohio Bar No. 96186
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
JRobbins@pacificlegal.org
ADaniel@pacificlegal.org

*Attorneys for Plaintiff*

*\*Notice of Special Appearance
forthcoming*

26