UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOE MANIS, | |
| Plaintiff, | |
| v. | |
| U.S. DEPARTMENT OF AGRICULTURE; THOMAS JAMES VILSACK, in his official capacity as the Secretary of Agriculture; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Inspection Service, | Civil Action No. 24-cv-175 |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

The Horse Protection Act ("HPA"), 15 U.S.C. §§ 1821-1831, imposes penalties on individuals who show or exhibit horses that have been deliberately injured, or "sored," through use of blistering agents, chains, nails, or tacks, to make them walk in a desirable way. Congress declared this practice to be "cruel and inhumane" more than 50 years ago, *id.* § 1822, and charged the Secretary of Agriculture with enforcing the HPA's prohibitions against it, including conducting hearings for civil violations, *id.* § 1825(b). Consistent with the Administrative Procedure Act ("APA") and administrative adjudications elsewhere in the government, the Secretary is assisted in his duties by other officials of the U.S. Department of Agriculture ("USDA"), including USDA's Judicial Officer and its administrative law judges ("ALJs").

1

If the agency has reason to believe that an individual has violated the HPA, USDA may institute enforcement proceedings before an ALJ. 7 C.F.R. §§ 1.131(a), 1.135. If either party disagrees with the ALJ's ruling, it may appeal to USDA's Judicial Officer, to whom the Secretary has long delegated the task of hearing certain categories of administrative appeals. See 7 U.S.C. § 2204-2; 7 C.F.R. § 2.35. After that, the losing party may avail itself of judicial review.

The Judicial Officer serves at the pleasure of the Secretary and is reviewed annually by the Deputy Secretary. He is bound by the scope of his delegation, which the Secretary can revoke at any time, and by the Secretary's Rules of Practice and substantive regulations (under the HPA and dozens of other statutes he adjudicates), which the Secretary retains the power to amend or revoke through the rulemaking process. The Judicial Officer can be removed from his position at any time, and the Secretary can step in and hear a case at any time, 7 C.F.R. § 2.12, *id.* § 1.132. The ultimate "supervision and control" of all functions of the USDA remains with the Secretary. *Id.* § 2.4.

Plaintiff seeks to dismantle this longstanding system by invoking Supreme Court decisions skeptical of "young entrants to the regulatory landscape." He alleges that because the Judicial Officer renders the "final decision" of the USDA in certain adjudications, he unconstitutionally exercises "principal officer power." Plaintiff alleges no plausible facts to support this assertion, however. Instead, he relies solely on a single conclusion—that the "Secretary cannot review final decisions of the Judicial Officer"—citing a Supreme Court case which expressly disclaimed reliance on any exclusive criterion to determine inferior officer status. Compl. ¶¶ 102-108. Relatedly, Plaintiff alleges that even though 7

2

U.S.C. § 2204-2 expressly vests the Secretary with the power to delegate, the Judicial Officer's power is unconstitutional because "he does not hold a statutorily created office." Compl. ¶ 114. Plaintiff also alleges that the longstanding tenure protections for ALJs violate the Constitution because the ALJs "enjoy two layers of tenure protection" through the Merit Systems Protection Board ("MSPB"), Compl. ¶ 138. And lastly, despite decades of contrary Supreme Court precedent, Plaintiff alleges that USDA's HPA claim against him can only be brought in an Article III court before a jury. Compl. ¶¶ 145, 173.

This Court already found that Plaintiff was unlikely to succeed on the merits of any of his claims for relief. Memorandum Opinion & Order, Dkt. 21 at 22. And the only other court to consider similar claims relating to the HPA rejected the arguments Plaintiff raises here. *McConnell v. USDA*, No. 4:23-cv-24, 2023 WL 5963782 (E.D. Tenn. Sept. 13, 2023). Plaintiff's Complaint here is rife with legal conclusions, *e.g.*, ¶ 102, but contains insufficient factual allegations to state a plausible claim for relief. Both precedent and the regulatory framework at issue here provide ample basis to dismiss Plaintiff's complaint under the Fed. R. Civ. P. 12(b)(6) standard. In light of the Court's inquiries at the hearing on the preliminary injunction hearing, however, Defendants have attached a declaration from USDA's Office of Human Resources Management, in the event the Court wishes to convert the motion to one for summary judgment.

# I.  STATEMENT OF FACTS

## A.  The Horse Protection Act

Congress enacted the HPA in 1970 to "help end the unnecessary and inhumane practice of soring horses" and to "destroy the incentive…for owners and trainers to

painfully mistreat these magnificent animals." H.R. Rep. 91-1597, 4872; *see* 15 U.S.C. § 1822 (Congressional statement of findings); *Fleming v. USDA*, 713 F.2d 179, 182 (6th Cir. 1983). "Sored" horses are horses that have been deliberately injured, "through use of chemical blistering agents, chains, tacks, or other devices," to artificially create a distinctive "high stepping" walk. *Id.* at 181-82. The HPA prohibits the owner of a horse from allowing it to be entered in a show or exhibition when the horse is sore. 15 U.S.C. § 1824(2)(D). A person who knowingly violates that statutory provision may face criminal penalties. *Id.* § 1825(a)(1). In civil matters, however, "[t]he owner need have no knowledge of the horse's being sore, nor need the owner bear any fault." *McCloy v. USDA*, 351 F.3d 447, 450 (10th Cir. 2003). Any statutory violation established after "notice and opportunity for a hearing" is subject to a civil penalty. *Id.* § 1825(b)(1). The Secretary may also order violators to be temporarily disqualified from participating in horse shows and exhibitions. *Id.* § 1825(c).

## B. USDA Hearings

USDA, like more than two dozen other agencies, has long used ALJs to hear initial administrative adjudications. *See* 5 U.S.C. § 556(b). When a statute requires adjudication on the record after notice and hearing, agencies follow the APA's formal process. *Id.* § 554. Within the formal adjudication process, however, the agency may determine whom it wishes to appoint as an initial decisionmaker (an ALJ or some other agency representative), *see id.* § 556(b), and has flexibility in how it chooses to review those initial decisions. *Id.* § 557(b)-(c). USDA follows this model for the Judicial Officer's review of the HPA and many other statutes. 7 U.S.C. § 2.35(a)(1). This is precisely the adjudication

4

model that the Supreme Court recently distinguished from an impermissible Congressional statutory limitation on review. *See United States v. Arthrex*, 594 U.S. 1, 19-20 (2021) (observing that Congress had traditionally "left the structure of administrative adjudication up to agency heads, who prescribed internal procedures (and thus exercised direction and control) as they saw fit").

If USDA has reason to believe that a person has violated the HPA, it may institute administrative proceedings by filing a complaint. 7 C.F.R. § 1.133(b)(1). The proceeding is assigned to an ALJ who holds a hearing and issues a decision. *Id.* §§ 1.141-1.142; *see also id.* § 1.132 (defining "Judge"). Any party who disagrees with the ALJ's decision may appeal to the Judicial Officer. *Id.* § 1.145. The Judicial Officer receives the parties' briefs, may hold oral argument, and issues a final decision on behalf of the Secretary. *Id*. Persons assessed a penalty may seek judicial review. 15 U.S.C. § 1825(b)(2).

This model of review—where an adjudicatory inferior officer is delegated review authority by a principal officer—has a long history in the USDA and other agencies. The Social Security Act's Appeals Council issues the final decision of the Commissioner in adjudications. *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000); *Parris v. Heckler*, 733 F.2d 324, 326 (4th Cir. 1984); 20 C.F.R. § 404.900. The Administrator of the Environmental Protection Agency ("EPA") has delegated authority to an Appeals Board to act "as the final decisionmaker in agency adjudications" in many types of cases, after years of using Judicial Officers in the same capacity. 57 Fed. Reg. 5320 (1992); *see also* 40 C.F.R. § 1.25(e)(1). The Department of Labor ("DOL") likewise uses adjudicators appointed by the Secretary as the final decisionmakers in two different settings. First, the Administrative

5

Review Board is "delegated authority … [to] issue[e] final agency decisions" under a wide range of employee protection laws. *See* 61 Fed. Reg. 19978-19979 (1996). Second, the Benefits Review Board, created in 1972, enters final decisions on workers' compensation claims under the Longshore and Harbor Workers' Compensation Act and the Federal Coal Mine Health and Safety Act. 33 U.S.C. § 921(c).

### C. Role of the Judicial Officer

The Secretary appoints the Judicial Officer and has delegated authority to him, 7 U.S.C. § 2204-2, to act as the final deciding officer in certain types of adjudications.[1] *See* 7 C.F.R. § 1.131, 2.35(a)(1)-(2). But the Secretary retains "supervision and control" of the Department's general functions. 7 C.F.R. § 2.4. To that end, the Secretary can revoke his delegation to the Judicial Officer "at any time." 7 U.S.C. § 2204-2, or can initiate rulemaking under 5 U.S.C. § 553 to amend 7 C.F.R. § 2.35 and change the scope of the Judicial Officer's role. The Secretary can adjudicate matters personally even without revoking the delegation. 7 C.F.R. § 2.12; *id.* § 1.132 (defining "Judicial Officer" as either the Judicial Officer "or the Secretary . . . if the authority so delegated is exercised by the Secretary").

The Judicial Officer must also obey the Secretary's regulations governing formal adjudicatory procedures, *see* 60 Fed. Reg. 8446 (Feb. 14, 1995); 7 C.F.R. Subpart H ("Rules of Practice"). For example, the Judicial Officer must rule on any appeal "as soon

---

[1] *See generally* USDA Office of Hearings and Appeals, OALJ/OJO Statutes Administered, https://www.usda.gov/oha/rules-and-procedures/statutes-administered (last updated May 2019). Hearings of adverse program decisions by the Farm Service Agency and other USDA agencies, are handled by USDA's National Appeals Division.

6

as practicable" after receipt of the record from the Hearing Clerk, or after oral argument was held. 7 C.F.R. § 1.145(i); *see also id.* § 1.146(b) (imposing similar requirement on petition for rehearing). The Rules of Practice also ban *ex parte* communications, and direct the Judicial Officer to take certain steps to place any such communications in the public record. *Id.* § 1.151(c).

The Judicial Officer is also bound by the Secretary's rules in other types of adjudications. *See* 7 C.F.R. §§ 900.50-900.71 (marketing order petitions); *id.* Part 1200, Subpart B (modification/exemption petitions); *id.* Part 283 (quality control claims); *id.* §§ 1.160-1.175 (cease and desist orders); *id.* §§ 47.1-47.49 (reparations proceedings under the Perishable Agricultural Commodities Act ("PACA")); *id.* §§ 202.1-202.44 (Federal Seed Act Administrative Procedure); 9 C.F.R. §§ 202.1-202.210 (proceedings under the Packers and Stockyards Act). For example, the Rules of Practice under the Packers and Stockyards Act ("PSA") require that the Judicial Officer "shall" consider a report of investigation, but direct him to give "greater weight" to oral testimony than the report. *Id.* § 202.104 Rule 4(c).

Similarly, the Judicial Officer must follow the Secretary's substantive implementing regulations for not only the HPA, 9 C.F.R. §§ 11.1 *et seq.*, but also dozens of statutes for which he acts as the deciding officer, including rate proceedings under the PSA and reparation proceedings under PACA. *See* 7 C.F.R. §§ 2.35(a)(1); *id.* § 1.131 (listing delegated authority for certain proceedings). The Judicial Officer, as a "general officer," 7 C.F.R. § 2.4, is also directed to bring to the Secretary's attention any "application of new principles of major importance," or any "departure" from established

7

principles. *Id.* § 2.11.

The Judicial Officer may be removed at any time and does not have employment protections like other federal employees. *See* Declaration of Bryan Knowles, attached as Exhibit A. ("Knowles Decl."), ¶ 2. His performance is evaluated annually in a performance plan signed by his Rating Official, the Deputy Secretary of Agriculture. *Id.* ¶ 3. The Deputy Secretary is a Presidentially-appointed and Senate-confirmed officer. 7 U.S.C. § 2210. The Judicial Officer is evaluated in the same manner as members of the Senior Executive Service. Knowles Decl. ¶ 4.

### D.   Procedural Background

On May 19, 2023, USDA initiated proceedings against Plaintiff, alleging that Plaintiff allowed the entry of a horse into a show while the horse was sore, in violation of 15 U.S.C. § 1824(2)(D). Compl. ¶ 68. Plaintiff filed his Complaint on March 1, and a Motion for a Temporary Restraining Order and Preliminary Injunction soon after. Doc. #7. This Court held a hearing on the Motion on April 17, and on April 24, entered an opinion and order denying Plaintiff's Motion and finding that he had not established a likelihood of success on the merits. Dkt. 21. Plaintiff appealed this ruling, Dkt. 22, and sought an injunction pending appeal. No. 24-1367, Dkt. 9. The Fourth Circuit denied Plaintiff's request for injunction pending appeal, *id.* Dkt. 13, but the appeal of the preliminary injunction order remains pending. Meanwhile, the administrative hearing took place during the week of April 29, 2024. *See id.* ¶ 78. The ALJ has not yet issued a decision.

## II.   QUESTIONS PRESENTED

1.   Whether Plaintiff has pled sufficient facts to state a claim that the Judicial

8

Officer is not subject to direction "at some level." Compl. ¶¶ 101-113.

2.  Whether an inferior office must be "statutorily created" and whether the Secretary's ability to step in and hear a case at any time provides ALJs with "principal officer supervision." Compl. ¶¶ 114-120.

3.  Whether Plaintiff has alleged actionable harm caused by ALJ tenure protections, and if so, whether the MSPB's review of an agency's removal of an ALJ for good cause is Constitutional. Compl. ¶¶ 129-141.

4.  Whether a jury trial in an Article III court is required for agency administrative enforcement of statutory claims created by Congress. Compl. ¶¶ 143-185.

## III.  <u>LEGAL STANDARDS</u>

### A.  **Fed. R. Civ. P. 12(b)(6)**

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action ... bare assertions devoid of further factual enhancement … unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

### B.  **Motion for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no

9

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if the outcome of the litigation might be affected, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Evidence that is "merely colorable" or is "not significantly probative" poses no bar to summary judgment. *Id.* at 250. The court views the facts in the light most favorable to the nonmovant, drawing only reasonable inferences in that party's favor. *Id.* at 255.

## IV.  ARGUMENT

### A.    USDA's Judicial Officer is an Inferior Officer.

Plaintiff's first claim for relief alleges that USDA's Judicial Officer is an improperly appointed principal officer. Compl. ¶¶ 100-127. Officers (unlike employees) exercise "significant authority" on behalf of the United States. *Lucia v. SEC*, 585 U.S. 237, 245 (2018). *Principal* officers must be appointed by the President with the advice and consent of the Senate, while *inferior* officers may be appointed by an agency department head. *Id.* at 244 (citing Art. II, § 2, cl. 2). Inferior officers are those "officers whose work is directed and supervised at some level by others who were appointed by" the President. *Edmond v. United States*, 520 U.S. 651, 663 (1997).

Plaintiff's Complaint is devoid of allegations regarding whether the Judicial Officer is directed or supervised "at some level." Instead, Plaintiff's claim hangs solely on a legal conclusion that *Arthrex* imposed an exclusive test of inferior officer status (reviewability) and an unsupported assertion that the Secretary cannot review the Judicial Officer's decisions. Compl. ¶¶ 102-108. These allegations are not entitled to the presumption of

10

truth, and they are not accurate. And if the Court considers USDA's declaration, it is beyond dispute that the Judicial Officer is supervised through an annual review and appraisal process by a rating official who is Presidentially-appointed. Knowles Decl. ¶¶ 3-4.

The Supreme Court has never set forth an "exclusive criterion" or "definitive test" for "distinguishing between principal and inferior officers." *Edmond*, 520 U.S. 661-662; *Seila Law LLC v. CFPB,* 591 U.S. 197, 218 (2020); *Arthrex*, 594 U.S. at 23; *Morrison v. Olson*, 487 U.S. 654, 671 (1988); *see also Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 506 (2010) (observing that "the very size and variety of the Federal Government . . . discourage general pronouncements"). The Supreme Court has also looked to the history of agency structures, and has emphasized that "[p]erhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law*, 591 U.S. at 220 (2020); *Arthrex*, 594 U.S. at 19-20 (discussing traditional model of agency heads "prescib[ing] internal procedures (and thus exercis[ing] direction and control) as they saw fit").

In *Morrison*, the Supreme Court considered whether the officer was subject to removal, along with the limited scope of her duties, jurisdiction, and tenure. *Edmond*, 520 U.S. at 661. In *Edmond*, however, the court considered officers with broad duties and jurisdiction—criminal appeals from the Coast Guard, including death penalty cases—but found that other factors, including removability, review, and general oversight, meant that the office was inferior. *Id.* at 663-666. The "power to remove officers . . . is a powerful tool for control." *Id.* at 664; *see also Free Enterprise*, 561 U.S. at 510 (assuming that board

11

members were removable at will, "we have no hesitation in concluding that under *Edmond* the Board members are inferior officers"). For example, in *Arthrex*, the Supreme Court expressly distinguished the DOL's Benefits Review Board ("BRB") from its holding, because even though the BRB members exercised final decisionmaking authority, its members, like the Judicial Officer here, "serve at the pleasure of the appointing department head." *Arthrex*, 594 U.S. at 21; *see also Kalaris v. Donovan*, 697 F.2d 376, 397 (D.C. Cir. 1983) (concluding that BRB members were inferior officers).[2]

Direction and supervision "at some level," *Edmond*, 520 U.S. at 663, can be established by structural power and authority, and does not require daily control. *Arthrex*, 594 U.S. at 25 ("If the Director were to have the 'authority to take control' of a PTAB proceeding, APJs would properly function as inferior officers."); *In re Palo Alto Networks, Inc.*, 44 F.4th 1369, 1376-77 (Fed. Cir. 2022) (collecting cases and observing that "structural authority, rather than supervisory activity," is a "key consideration"). The Supreme Court has repeatedly recognized that, in the context of adjudication, inferior officers can properly exercise "significant discretion," *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991), and direct oversight or involvement may be improper. *See Collins v. Yellen*, 141 S. Ct. 1761, 1783 n.18 (recognizing precedent that an adjudicatory body had a "unique need" for freedom from executive interference); *Myers v. United States*, 272 U.S.

---

[2] Similarly, two Circuits have rejected challenges to the DOL's Administrative Review Board, whose members, like the Judicial Officer, issue final decisions and are subject to removal at will. *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 494 (5th Cir. 2005); *Varnadore v. Sec'y of Lab.*, 141 F.3d 625, 629-31 (6th Cir. 1998).

52, 135 (1926) ("[T]here may be duties of a quasi judicial character imposed on executive officers … the discharge of which the President cannot in a particular case properly influence or control."). In such cases, the power of removal, along with the power to prescribe rules of procedure, can establish the necessary oversight. See *Morrison*, 487 U.S. at 671 (role restricted to "certain federal crimes"); *Edmond*, 520 U.S. at 666 (discussing power to "prescribe uniform rules of procedure"); *Pennsylvania v. HHS*, 80 F.3d 796, 804 (3d Cir. 1996) (recognizing that power to appoint judges and assign them categories of cases "necessarily includes the concomitant power to remove them and/or to curtail their duties").

Here, for more than 70 years, and like the Social Security Administration, EPA, and DOL, the Secretary has delegated to the Judicial Officer the authority to render decisions in certain adjudications. 7 C.F.R. § 2.35(a). But the Secretary retains "supervision and control" of the USDA, *id.* § 2.4: he can his revoke his delegation to the Judicial Officer "at any time," 7 U.S.C. § 2204-2, and he can amend 7 C.F.R. § 2.35 or any of the applicable Rules of Practice to alter the scope of the Judicial Officer's role or limit the types of adjudications the Judicial Officer can handle.[3] See *In re Grand Jury Investigation*, 916 F.3d 1047, 1052 (D.C. Cir. 2019) (finding that officers were inferior because limitations were in regulations that the Attorney General could revise or repeal).

The Secretary can also adjudicate matters personally even without revoking the

---

[3] By contrast, *Arthrex* involved a statute that *expressly precluded* the relevant principal officer from reviewing Board decisions. *See* 35 U.S.C. § 6(c) ("Only the Patent Trial and Appeal Board may grant rehearings.").

13

delegation. 7 C.F.R. § 2.12; *id.* § 1.132 (defining "Judicial Officer" to include the "Secretary"); *Fleming v. USDA*, 987 F.3d 1093, 1103 (D.C. Cir. 2021) ("The Secretary may, at his election, step in and act as final appeals officer in any case."). For example, in *In re Apex Meat Co.*, 47 Agric. Dec. 557, 1988 WL 242869 (Mar. 4, 1988), then-Secretary Lyng issued an order "assum[ing] direct authority for all further rulings and orders" and vacated prior stay orders issued by the Judicial Officer.[4] *See In re Palo Alto*, 44 F.4th at 1375 (rejecting Appointments Clause challenge where principal officer "has the authority to revoke the delegation or to exercise her review authority in individual cases despite the delegation").

The Secretary's control over the Judicial Officer role is not limited to the power to remove him or revoke the delegation. As discussed *supra* p. 7, the Judicial Officer must follow a host of procedural regulations regarding the conduct of proceedings. *E.g.*, 9 C.F.R. § 202.104 Rule 4(c) (assigning weight that Judicial Officer must give to different types of evidence); 7 C.F.R. § 1.151(c) (requiring certain procedures if Judicial Officer receives *ex parte* communications). "The Judicial Officer has no authority to depart from the Department's rules of practice." *In Re Sequoia Orange Co., Inc., et al.*, 41 Agric. Dec. 1062, 1064 (June 21, 1982) (refusing expansive intervention because "the Secretary …

---

[4] Aside from *Apex* and *Utica Packing v. Block*, 781 F.2d 71 (6th Cir. 1986), it does not appear that a Judicial Officer has otherwise been affirmatively removed from a case, though a Judicial Officer did disqualify himself "in a case or two." *In re: Great Am. Veal Co.*, 45 Agric. Dec. 1770, 1847 (1986). Counsel was unable to determine whether and when the Secretary has otherwise stepped in to hear an appeal in lieu of Judicial Officer. But as *Palo Alto* and *Arthrex* both recognize, it is the <u>authority</u> of a principal officer to take control, and not the regular exercise of that power, that is significant.

14

has established procedural rules prohibiting the Judicial Officer from permitting intervention, except to the extent set forth above"). The Judicial Officer must also faithfully apply USDA's substantive regulations, and bring to the Secretary's attention any "application of new principles of major importance," or any "departure" from established principles. 7 C.F.R. § 2.11. Similarly, the Judicial Officer has also referred to USDA policy statements for guidance. *See, e.g.*, *Great Am. Veal Co.*, 45 Agric. Dec. at 1858-65.

In sum, the Judicial Officer is removable at will and serves under the direction of the Secretary and under the supervision of the Deputy Secretary. Knowles Decl. ¶¶ 3-4. Under any reading of Supreme Court precedent, the Judicial Officer is an inferior officer whose work "is directed and supervised at some level" by principal officers. *Edmond*, 520 U.S. at 663. Plaintiff's Appointments Clause claim therefore fails.

1. Officers established by regulation are "established by law."

Plaintiff alleges that the Judicial Officer's position is not "established by law" because no statute creates the position. Compl. ¶ 114. This legal conclusion is unsupported and incorrect. Principal officers "shall be established by Law: but the Congress may by Law vest the Appointment" of inferior officers in the "Heads of Departments." U.S. Const. art. II, § 2, cl. 2. That is precisely the case here: Congress vested power in the Secretary "to designate officers . . . to whom functions may be delegated . . . and to assign appropriate titles to such officers." 7 U.S.C. § 2204-2. He has done so by regulation for decades. *See also* 10 Fed. Reg. 13769 (Nov. 9, 1945); 7 C.F.R. § 1.132; *id.* § 2.4. Other courts agree that this type of delegation passes Constitutional muster. *Willy*, 423 F.3d at 494 (statute

15

allowed Secretary of Labor to create Administrative Review Board by regulation and delegate authority to it); *Pennsylvania v. HHS*, 80 F.3d at 804-05 (rejecting argument that HHS Appeals Board was unconstitutional).

### 2. ALJs are properly supervised.

Plaintiff alleges that ALJ decisions are improperly "not subject to review" by any principal officer. Compl. ¶ 126. This allegation is contrary to law and not entitled to a presumption of truth. *See* 7 C.F.R. §§ 2.12 & 1.132 (Secretary is permitted to exercise authority otherwise delegated to Judicial Officer). In *Fleming*, the D.C. Circuit concluded that the ALJs were properly appointed because they "are subject to substantial oversight by the Secretary," and they "must follow the Secretary's procedural and substantive regulations." 987 F.3d at 1103-04. "And the ALJs' decisions may be appealed to the Judicial Officer, whom the Secretary can remove at will. Moreover, the Secretary (a principal officer) has considerable influence over whether an ALJ's decision becomes the final decision of the agency." *Id.* at 1103. For example, he may, "at his election, step in and act as final appeals officer in any case." *Id.* (citing 7 C.F.R. § 2.12). Plaintiff therefore cannot state a claim for relief on these grounds either.

### B. The ALJs' Tenure Protections Do Not Violate the Constitution.

Plaintiff's second claim for relief alleges that the ALJ's tenure protections "contravene" separation of powers principles. Compl. p. 18. But Plaintiff has not alleged that the tenure protections have "cause[d] harm" by prejudicing the President's control of the proceedings. *Collins v. Yellen*, 141 S. Ct. 1761, 1788-89 (2021); *K&R Contractors v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) (discussing *Collins*' examples of harm, e.g., that

16

the President attempted to remove the officer); *see also Calcutt v. FDIC*, 37 F.4th 293, 318-20 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023). Plaintiff has not alleged any harm caused by the tenure protections, let alone that the President wished to remove the ALJ or expressed displeasure with her actions. For this reason alone, Plaintiff has not stated a plausible claim for relief.

Plaintiff's claim also fails because Congress may restrict the President's ability to remove inferior officers, like ALJs, "with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Plaintiff's allegation relies on *Free Enterprise Fund*, Compl. ¶ 130, a case analyzing—unlike here—a novel dual-tenure system. But in *Free Enterprise*, SEC Commissioners (with their own rigorous tenure protections) were substantially restricted in their ability to remove members of the Public Company Accounting Oversight Board, a unique entity with expansive powers, including policymaking and investigations. 561 U.S. at 485. While the Supreme Court criticized that regulatory structure, it distinguished ALJs and noted that its holding "does not address that subset of independent agency employees who serve as administrative law judges." 561 U.S. at 507 n.10. It also observed that—unlike the significant enforcement powers held by the board at issue—ALJs "of course perform adjudicative rather than enforcement or policymaking functions." *Id.*; *accord Calcutt*, 37 F.4th at 319 ("doubt[ing]" that petitioner "could establish a constitutional violation").

Notably, *Free Enterprise* explicitly declined to "reexamine" *Morrison*, which approved a good-cause limitation on removing an inferior officer even though the good cause determination was reviewed by an Article III court. 561 U.S. at 483; *see Morrison*,

487 U.S. at 693 n.33 ("The possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority."). An ALJ is removable "by the agency in which the [ALJ] is employed," 5 U.S.C. § 7521(a), not by the MSPB.[5] The MSPB's role, like that of the court referenced in *Morrison*, is to determine whether the requisite "good cause" exists if an ALJ challenges the agency's removal decision. *See id.* If the review of a good cause determination by an entity wholly outside the Executive Branch withstands Constitutional scrutiny, then so too does the MSPB's review here.

Other factors distinguish *Free Enterprise* as well. First, ALJ decisions are "subject to vacatur" by the Judicial Officer, who serves at will, unlike the SEC Commissioners. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1134-5 (9th Cir. 2021). Second, the Supreme Court described the PCAOB's structure as "highly unusual" and "lack[ing] … historical precedent." *Free Enterprise*, 561 U.S. at 496, 505. Here, of course, ALJs have been part of agencies since the New Deal. *See Decker*, 8 F.4th at 1132 (rejecting that *Free Enterprise*'s "limited holding" applied to ALJs). Third, ALJs' removal protections are not as stringent as the "rigorous" removal limitations in *Free Enterprise*. *See* 561 U.S. at 496, 503. By contrast, the "good cause" standard in 5 U.S.C. § 7521 allows ALJs to be removed for misconduct, poor performance, or insubordination. *See Abrams v.*

---

[5] One of the questions presented to the Supreme Court in *SEC v. Jarkesy*, No. 22-859, concerns for cause removal for ALJs <u>in agencies whose heads enjoy for-cause removal protection</u>. *See also Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022) ("And the SEC Commissioners may only be removed by the President for good cause.").  Here, the Secretary can be removed by the President at will.

*Soc. Sec. Admin.*, 703 F.3d 538, 543 (Fed. Cir. 2012) (good cause "includ[es] all matters which affect the ability and fitness of the ALJ to perform the duties of office").

In sum, "Congress has not tied the President's hands and hindered his control over his subordinates here." *Decker Coal* at 1133-34; *Calcutt*, 37 F.4th at 319; 5 U.S.C. § 556(b). Unlike the statute at issue in *K&R Contractors*, 86 F.4th at 148, the HPA does not require the use of ALJs. Rather, the agency maintains power to determine its adjudicatory process of choice. *See Free Enterprise Fund v. Public Co. Accounting Oversight Bd*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("Congress has not imposed ALJs on the Executive Branch."). This, along with the quasi-judicial nature of the ALJs' role and the relatively limited protection offered by the good cause standard, indicates that the ALJs' removal protections are compatible with the separation of powers. Plaintiff therefore cannot state a viable claim for relief.

### C. USDA's Hearing Process Violates Neither the Seventh Amendment nor Article III.

Plaintiff also cannot survive Rule 12 as to his final two claims, which allege that USDA's administrative-adjudication system violates his right to a jury trial in an Article III court. Compl. ¶¶ 142-185.

The Seventh Amendment preserves the "right of trial by jury" in "suits at common law, where the value in controversy shall exceed twenty dollars." *See also Sasser v. Administrator*, 990 F.2d 127, 129 (4th Cir. 1993). But "when Congress properly assigns a matter to adjudication in a non-Article III tribunal, 'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.'" *Oil States*

19

*Energy Servs. LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 345 (2018) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53-54 (1989)); *accord Atlas Roofing Co. v. OSHA*, 430 U.S. 442, 450-55 (1977). Because the question of whether a Seventh Amendment right to trial by jury overlaps considerably with the question of whether a matter was properly assigned to a non-Article III court, Defendants analyze Plaintiff's last two claims together. *See Oil States*, 584 U.S. at 345.

"When determining whether a proceeding involves an exercise of Article III judicial power," the Supreme Court has "distinguished between 'public rights' and 'private rights.'" *Oil States*, 584 U.S. at 334 (citation omitted). Matters "arising between the Government and persons subject to its authority" are public rights. *Stern v. Marshall*, 564 U.S. 462, 489 (2011) (quotation omitted). They are rights "integrally related to particular Federal Government action," *id.* at 490-91, or "where the Government is involved in its sovereign capacity." *Atlas Roofing*, 430 U.S. at 458. By contrast, "private rights" involve "the liability of one individual to another [private party] under the law as defined," not disputes with the government. *Stern*, 564 U.S. at 489, 493 (quotation omitted).

As to matters involving "public rights," Congress has "significant latitude to assign adjudication of [such] rights to entities other than Article III courts." *Oil States*, 584 U.S. at 334; *Atlas Roofing*, 430 U.S. at 455 ("When Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible."). USDA adjudications under the HPA involve public rights that Congress has created and, thus, are properly assigned to an administrative forum. Congress used its constitutional "power to regulate commerce," *Atlas Roofing*, 430 U.S. at 456, to

20

"help end the unnecessary and inhumane practice of soring horses." H.R. Rep. 91-1597, 4872 (1970). Congress further observed that the "Tennessee Walking Horse exhibitors have not" taken action to end the cruel practice "by themselves," necessitating Congressional action. *Id.* To that end, Congress "created new statutory obligations" in the HPA, provided penalties for violations, and entrusted to the Secretary "the function of deciding whether a violation has in fact occurred." *Atlas Roofing*, 430 U.S. at 450. Congress then assigned adjudication of civil penalties under the HPA exclusively to USDA's administrative hearing system. *See* 15 U.S.C. § 1825(d)(6) (exempting subsection (b), civil penalty proceedings, from district court jurisdiction).

Plaintiff nonetheless alleges that he is entitled to a jury trial in an Article III court because USDA's enforcement of the HPA is somehow "a common law tort claim," a common law fraud claim, or a breach of contract claim. Compl. ¶¶ 145-146. Any purported analogy to any of these claims is irrelevant here because Congress's power to assign an enforcement proceeding to a non-Article III tribunal does not depend on the extent to which that proceeding resembles common-law actions. *Granfinanciera*, 492 U.S. at 52-53 ("Congress may fashion causes of action that are closely analogous to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable.").

In *Atlas Roofing*, for example, the Supreme Court held that an agency could conduct adjudications to enforce workplace-safety rules, even though such disputes historically were resolved through "common-law actions." 430 U.S. at 445. Similarly, in *Sasser*, the Fourth Circuit rejected the claim that an action in the district court was the only permissible

21

forum for Clean Water Act violations. 990 F.2d 127, 130. The court held that the EPA's claim for civil penalties "clearly involves statutory public rights," and that the Seventh Amendment "did not prohibit the assessment of a civil penalty ... without the intervention of a jury." *Id.* Crucially, *Sasser* distinguishes *United States v. Tull*, 481 U.S. 412 (1987), because the latter arose before Congress had amended the Clean Water Act to allow civil penalties in administrative proceedings. *Sasser*, 990 F.2d at 129. In short, *Tull* stands only for the proposition that when the Government brings a claim for civil penalties *in an Article III court*, the defendant is entitled to a jury trial. *See id.*; Compl. ¶ 149. It does not alter the longstanding rule that Congress may assign adjudication of public rights to an administrative forum. *See Tull*, 481 U.S. at 418 n.4 (recognizing that the Seventh Amendment does not apply to administrative proceedings).

Even if Plaintiff were correct in his view of the law, he fails to establish any serious similarity between an HPA violation and the elements of any common law claim. USDA alleges that Plaintiff violated the HPA by allowing the entry into a show of a horse that had been sored. This violation does not require knowledge or any intent to deceive, like a fraud claim would. It also does not require that USDA show any harm or damages to any competitor—to the contrary, inspectors disqualify a sored horse before the event, Compl. ¶ 40, meaning that no private litigant would be able to state a fraud, tort, or breach of contract claim. And Congress expressly recognized, in passing the HPA, that the industry had not adequately policed itself to that point, resulting in bad actors "inflicting great pain" on horses in competition. H.R. Rep. 91-1597, 4872. Congress thus used its authority to create an entirely new form of relief. As a result, Plaintiff cannot survive Rule

22

12 as to his Seventh Amendment and Article III claims.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiff's Complaint with prejudice, or in the alternative, award the United States summary judgment on all of Plaintiff's claims.

This the 20th day of May, 2024.

Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney

_____
Cassie L. Crawford, NCSB # 45396
Assistant U.S. Attorney
101 South Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
(336) 333-5351
cassie.crawford@usdoj.gov

23

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

JOE MANIS,

       Plaintiff,

       v.

U.S. DEPARTMENT OF AGRICULTRE;
THOMAS JAMES VILSACK, in his
official capacity as the Secretary of
Agriculture; MICHAEL WATSON, in his
official capacity as Administrator of the
Animal and Plant Inspection Service,

       Defendants.

Civil Action No. 24-cv-175

## CERTIFICATE OF WORD COUNT

I certify that this Response complies with the word count limit set forth in L.R. 7.3(d). The number of words in this Response, exclusive of the caption, signature lines, certificate of service, and any cover page or index, according to the word count feature of the word processing software used to prepare the Response, does not exceed 6,250 words.

This the 20th day of May, 2024.

Respectfully submitted,

_____
Cassie L. Crawford, NCSB # 45396
Assistant U.S. Attorneys
101 South Edgeworth Street, 4th Floor
Greensboro, North Carolina 27401
(336) 333-5351
cassie.crawford@usdoj.gov

24

JOE MANIS,

        Plaintiff,

        v.

U.S. DEPARTMENT OF AGRICULTRE;
THOMAS JAMES VILSACK, in his
official capacity as the Secretary of
Agriculture; MICHAEL WATSON, in his
official capacity as Administrator of the
Animal and Plant Inspection Service,

        Defendants.

Civil Action No. 24-cv-175

## CERTIFICATE OF SERVICE

        I hereby certify that on May 20, 2024, the foregoing (including exhibits, if any) was

electronically filed with the Clerk of the Court using the CM/ECF system, and that copies

of the documents were served via the CM/ECF system on all counsel of record.

        Respectfully submitted,

        _____
        Cassie L. Crawford, NCSB # 45396
        Assistant U.S. Attorneys
        101 South Edgeworth Street, 4th Floor
        Greensboro, North Carolina 27401
        (336) 333-5351
        cassie.crawford@usdoj.gov