IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOE MANIS,                          )
                                    )
          Plaintiff,                )
                                    )
     v.                             )
                                    )
U.S. DEPARTMENT OF AGRICULTURE; )       1:24-cv-175
BROOKE ROLLINS, in her official )
capacity as the Secretary of    )
Agriculture; MICHAEL WATSON, in )
his official capacity as        )
Administrator of the Animal and )
Plant Health Inspection Service,)
                                    )
          Defendants.[1]             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendants' Motion to Dismiss Pursuant
to Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary
Judgment, (Doc. 26), and Plaintiff's Cross-Motion for Summary
Judgment, (Doc. 32). For the reasons stated herein, Defendants'
motion will be granted, and Plaintiff's motion will be denied.

---

[1] "Indeed, when officials sued in [their official] capacity
in federal court . . . leave office, their successors
automatically assume their roles in the litigation." Hafer v.
Melo, 502 U.S. 21, 25 (1991); see also Fed. R. Civ. P. 25(d)
("The officer's successor is automatically substituted as a
party.").

# I.   FACTUAL BACKGROUND

## A.   USDA Agency Structure

The United States Department of Agriculture ("USDA") is a statutorily created executive department, see 7 U.S.C. § 2201, "under the supervision and control of a Secretary of Agriculture, who shall be appointed by the President, by and with the advice and consent of the Senate," id. § 2202. The Secretary of Agriculture ("Secretary") is "authorized to designate officers or employees of the Department to whom functions may be delegated under this section and to assign appropriate titles to such officers or employees." Id. § 2204-2. She may delegate her regulatory functions to any "officer or employee designated under this section,"

> [w]henever [she] deems that the delegation of the whole or any part of any regulatory function which the Secretary is, now or after April 4, 1940, required or authorized to perform will result in the more expeditious discharge of the duties of the Department of Agriculture[.]

7 U.S.C. § 2204-2. And she "may at any time revoke the whole or any part of a delegation or designation made by [her] under this section," id., but such revocation "shall not be retroactive, and each regulatory function or part thereof performed (within the scope of the delegation) by such individual prior to the revocation shall be considered as having been performed by the Secretary," id. § 2204-3.

- 2 -

The Secretary has, by regulation, delegated her final decision-making power in adjudicatory proceedings to a designated "Judicial Officer," see 7 C.F.R. § 2.35, defined as "any person or persons so designated by the Secretary of Agriculture," id. § 2.35(c). However, by regulation, "[n]o delegation of authority by the Secretary . . . shall preclude the Secretary . . . from exercising any of the authority so delegated." Id. § 2.12; see also id. § 1.132 (defining "Judicial Officer" as "an official of the [USDA] delegated authority by the Secretary of Agriculture . . . or the Secretary of Agriculture" (emphasis added)).

Pursuant to the Uniform Rules of Practice for the USDA, the Judicial Officer, upon the filing of an appeal petition, see id. § 1.145(a), reviews the decisions of USDA Administrative Law Judges ("ALJs"), who are appointed pursuant to 5 U.S.C. § 3105, and who oversee agency enforcement proceedings, see 7 C.F.R. §§ 1.131(a), 1.319.

## B.   <u>Horse Protection Act</u>

The "soring" of horses refers to the practice of intentionally injuring or distressing a horse to achieve a certain style of trotting. See 15 U.S.C. § 1821(3). Congress has found this practice to be "cruel and inhumane," to create unfair competition in horse shows and exhibitions, and to burden

- 3 -

interstate and foreign commerce. See id. § 1822. Accordingly,
the Horse Protection Act of 1970 ("HPA") prohibits various
actions related to the soring of horses. Id. §§ 1821–1831. As
relevant here, the HPA prohibits horse owners from allowing sore
horses to be "enter[ed] for the purpose of showing or exhibiting
in any horse show or horse exhibition." Id. § 1824(2).

As of 2023, a violation of this provision of the HPA could
result in civil penalties of not more than $6,781 for each
violation. See id. § 1825(b)(1); Civil Monetary Penalty
Inflation Adjustments for 2023, 88 Fed. Reg. 30029, 30032 (May
10, 2023) (codified as amended at 7 C.F.R. pt. 3). But a penalty
may not be assessed

> unless such person is given notice and opportunity for
> a hearing before the Secretary with respect to such
> violation. The amount of such civil penalty shall be
> assessed by the Secretary by written order. In
> determining the amount of such penalty, the Secretary
> shall take into account all factors relevant to such
> determination, including the nature, circumstances,
> extent, and gravity of the prohibited conduct and,
> with respect to the person found to have engaged in
> such conduct, the degree of culpability, any history
> of prior offenses, ability to pay, effect on ability
> to continue to do business, and such other matters as
> justice may require.

15 U.S.C. § 1825(b)(1). In addition to the imposition of civil
penalties, violators may also be

> disqualified by order of the Secretary, after notice
> and an opportunity for a hearing before the Secretary,
> from showing or exhibiting any horse, judging or
> managing any horse show, horse exhibition, or horse

sale or auction for a period of not less than one year
for the first violation and not less than five years
for any subsequent violation.

Id. § 1825(c).

Federal regulations state that

[t]he Department [of Agriculture] retains the
authority to initiate enforcement proceedings with
respect to any violation of the [Horse Protection]
Act, including violations for which penalties are
assessed in accordance with this section, and to
impose the penalties authorized by the Act if the
Department determines that such actions are necessary
to fulfill the purpose of the Act and this part.

9 C.F.R. § 11.25(f). The Uniform Rules of Practice for the
Department of Agriculture delineated in 7 C.F.R. § 1.130 et seq.
apply to proceedings associated with violations of the Horse
Protection Act. 7 C.F.R. § 1.131(a); 9 C.F.R. § 12.1.

To institute an HPA enforcement action, the USDA files a
complaint. 7 C.F.R. § 1.133(b)(1). Once a complaint has been
filed, an assigned ALJ will "hold hearings and perform related
duties," and make "initial decisions in adjudication . . .
proceedings." Id. § 2.27(a)(1). Those decisions are final unless
appealed to the "Secretary," which is defined by regulation to
mean "the Secretary of Agriculture, the Judicial Officer, or
other officer or employee of the Department delegated . . .
'regulatory functions' . . . in acting as final deciding officer
in adjudication." Id.; see id. § 1.145 (describing process for
appealing a decision to Judicial Officer).

- 5 -

C.    **Plaintiff Manis**

Plaintiff Joe Manis has been an active member of the North Carolina Walking Horse Association ("NCWHA") for the last thirty years and owns walking horses, "one of which is regularly shown in competitions across the southeast." (Compl. (Doc. 1) ¶ 1.) On May 19, 2023, the USDA Administrator of the Animal and Plant Health Inspection Service ("APHIS") filed a complaint against Manis. (Compl. (Doc. 1) ¶ 68.) The complaint "allege[ed] that [Manis] violated the HPA by allowing the entry of a horse he owned into a Virginia horse show while the horse was allegedly sore." (Id.) Manis denies the allegation against him. (Id. ¶ 70.)

On February 22, 2024, Manis "moved to dismiss on the grounds that the USDA's internal adjudication process is unconstitutionally structured," because 1) "USDA's Judicial Officer unlawfully enters final decisions for USDA either as an employee or an improperly appointed officer in violation of the Appointments Clause," 2) "USDA ALJs are improperly supervised by the Judicial Officer in violation of the Appointments Clause," 3) "USDA ALJs are unconstitutionally shielded from removal by two layers of tenure protection," 4) "USDA's internal adjudication process violates the Seventh Amendment's guarantee of a jury trial for suits at common law," and 5) "USDA's

- 6 -

internal adjudication process violates Article III's requirement that suits involving private rights be heard in an Article III court." (Id. ¶ 72.)

On February 1, 2025, the ALJ in Plaintiff Manis's administrative adjudication issued her initial ruling. (See Pl.'s Ex. 1, ALJ Initial Decision (Doc. 42-1).) She ruled that Manis had violated the HPA, (id. at 7), and assessed a $10 civil penalty and a one-year disqualification pursuant to 15 U.S.C. § 1825, (see id. at 11). As to Manis's constitutional arguments, she stated that they "are preserved for appeal to higher authorities," but that she "lack[ed] the authority to decide these issues." (Id. at 7.) Manis has appealed the ALJ's order to the USDA Judicial Officer and has been granted a stay of that appeal pending decision of this court. (See Pl.'s Ex. A, Stay Order (Doc. 50-1) at 2.)

Plaintiff Manis, in the present suit, raises constitutional challenges in pursuit of the following relief. First, he seeks five declaratory judgments, pursuant to 28 U.S.C. § 2201: 1) a declaratory judgment that "the Secretary's delegation of final decision-making authority in USDA adjudications to the Judicial Officer violates the United States Constitution's Appointments Clause," 2) a declaratory judgment that "USDA's ALJs are unconstitutionally supervised in violation of the United States

- 7 -

Constitution's Appointments Clause," 3) a declaratory judgment that "USDA's dual-layer tenure protection violates the United States Constitution's separation of powers in Article II," 4) a declaratory judgment that "USDA's administrative enforcement scheme violates the United States Constitution's Seventh Amendment right to a jury trial," and 5) a declaratory judgment that "USDA's administrative enforcement scheme violates Article III of the United States Constitution." (Compl. (Doc. 1) ¶¶ 186–90.) Plaintiff Manis also seeks a permanent injunction of the pending administrative enforcement proceeding against him based on any of the aforementioned alleged constitutional infirmities, (id. at ¶¶ 186–92), and an award of attorney fees, (id. ¶ 193).

## II.  PROCEDURAL HISTORY

Plaintiff filed his Complaint against Defendants on March 1, 2024. (Compl. (Doc. 1).) Plaintiff moved for a temporary restraining order and preliminary injunction on March 6, 2024. (Doc. 7.) This court denied Plaintiff's motion for a temporary restraining order on March 27, 2024, (Doc. 16), and denied Plaintiff's motion for a preliminary injunction on April 24, 2024, (Doc. 21). Plaintiff appealed this court's denial of his motion for preliminary injunction, (see Doc. 43), and that appeal has since been resolved by the Fourth Circuit, (see Docs. 52, 53).

On May 20, 2024, Defendants filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary Judgment, (Doc. 26), and a memorandum in support, (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Doc. 27)). On June 20, 2024, Plaintiff filed a Combined Response in Opposition to Defendants' Motion to Dismiss or, in the Alternative, Summary Judgment and Cross-Motion for Summary Judgment, (Doc. 32), and a memorandum in support, (Pl.'s Combined Resp. in Opp'n to Defs.' Mot. to Dismiss, or in the Alternative, Summ. J. and Mem. in Supp. of Cross-Motion for Summ. J. ("Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J.") (Doc. 33)). On August 5, 2024, Defendants filed their Combined Reply in Support of Defendants' Motion . . . for Summary Judgment, and Response in Opposition to Plaintiff's Cross Motion for Summary Judgment, ("Defs.' Reply & Resp. in Opp'n") (Doc. 36). On August 14, 2024, Plaintiff filed a reply in support of his Cross-Motion for Summary Judgment, (Pl.'s Reply (Doc. 37)).

On June 27, 2025, this court requested the parties submit supplemental briefing to address how intervening Supreme Court case, Kennedy v. Braidwood Management, Inc., 606 U.S. ---, 145 S. Ct. 2427 (2025), may impact the legal questions at issue in this case. The parties submitted their respective supplemental

briefing on July 11, 2025. (Pl.'s Suppl. Mem. (Doc. 50); Defs.' Suppl. Mem. (Doc. 49).)

## III. **JURISDICTION**

If a person is found to have violated the HPA and a civil penalty is assessed, he may "obtain review in the court of appeals of the United States for the circuit in which such person resides or has his place of business or in the United States Court of Appeals for the District of Columbia Circuit." 15 U.S.C. § 1825(b)(2). The court of appeals has the authority to set aside the findings of the Secretary if they are "found to be unsupported by substantial evidence." Id. This is a common method of agency action review that the Supreme Court has found "divests district courts of their ordinary jurisdiction over the covered cases." See Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. 175, 185 (2023); see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489 (2010) ("Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures 'are to be exclusive.'").

"But a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action." Axon, 598 U.S. at 185. Rather, to determine whether a district court is precluded from hearing a particular claim because of a

- 10 -

specific statutory agency action review scheme, courts must consider three factors first articulated in Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994). Id. at 186. First, the court considers whether "precluding district court jurisdiction [could] 'foreclose all meaningful judicial review' of the claim." Id. (quoting Thunder Basin Coal Co., 510 U.S. at 212–13). Next, the court considers whether the claim is "wholly collateral to [the] statute's review provisions." Id. (citation omitted). Finally, the court considers whether the claim is "outside the agency's expertise." Id. (citation omitted).

The Supreme Court's application of these three factors in Free Enterprise Fund and Axon decides the jurisdictional question here. In Free Enterprise Fund and in Axon, the plaintiffs did not challenge a "specific substantive decision" by the agency nor "commonplace procedures agencies use to make such a decision," rather, these plaintiffs challenged "the structure or very existence of an agency: They charge that an agency is wielding authority unconstitutionally in all or a broad swath of its work." Id. at 189. The Supreme Court, in both cases, found that the Thunder Basin factors favored district court review. Id. at 195–96; Free Enter. Fund, 561 U.S. at 490–91.

Here, as in Free Enterprise Fund and Axon, Plaintiff's challenges to the USDA adjudication against him are not in reference to specific substantive decisions or commonplace procedures. Rather, Plaintiff's challenges attack the constitutionality of "the structure or very existence of [the USDA]." See Axon, 598 U.S. at 189. And although Plaintiff Manis could "(eventually) obtain judicial review of [his] constitutional claims through an appeal from an adverse agency action to a court of appeals," id. at 190–91, because he challenges the legitimacy of the agency proceeding itself, judicial review of his claim, which would necessarily come after the conclusion of the agency proceeding, "would come too late to be meaningful." Id. at 191. Further, because Plaintiff challenges the USDA's "power to proceed at all, rather than actions taken in the agency proceedings," his challenge is "collateral" to the merits of the agency action itself. Id. at 192–93. Finally, his constitutional challenges are outside the expertise of the agency. See id. at 195 ("[A]gency adjudications are generally ill suited to address structural constitutional challenges." (citation omitted)); Free Enter. Fund, 561 U.S. at 491 ("Petitioners' constitutional claims are also outside the Commission's competence and expertise."); (see also Pl.'s Ex. 1,

ALJ Initial Decision (Doc. 42-1) at 7 ("I lack the authority to decide these issues.")).

In light of <u>Free Enterprise Fund</u> and <u>Axon</u> and an application of the <u>Thunder Basin</u> factors, this court finds that it has jurisdiction to adjudicate Plaintiff's claims.

## IV. <u>STANDARD OF REVIEW</u>

Defendants filed a motion to dismiss or in the alternative a motion for summary judgment, (Doc. 26), which was so designated in the caption. Plaintiff was thus on notice of the possibility that this court could treat Defendants' motion as one for summary judgment. <u>See</u> <u>Laughlin v. Metro. Washington Airports Auth.</u>, 149 F.3d 253, 260-61 (4th Cir. 1998); <u>see</u> Fed. R. Civ. P. 12(d). Because Plaintiff did not voice any objections to that possibility, nor request further time for discovery, this court may construe Defendants' pending motion as a motion for summary judgment. <u>See</u> <u>Laughlin</u>, 149 F.3d at 261.

Plaintiff filed a cross-motion for summary judgment. (Doc. 32.)

> When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law." When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion.

- 13 -

Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal citations omitted).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." Id. at 719 (citing Anderson, 477 U.S. at 247-48).

## V.    **ANALYSIS**

In his Complaint, Plaintiff asserts several constitutional infirmities in the USDA administrative adjudication structure

- 14 -

and process. In "Count I" of his Complaint, Plaintiff asserts that the UDSA's "Judicial Officer unconstitutionally exercises principal officer power" in violation of Article II of the Constitution. (Compl. (Doc. 1) ¶¶ 100–27.) In "Count II," Plaintiff asserts that the "USDA ALJs' dual-layer tenure protection contravenes the U.S. Constitution's Separation of Powers." (Id. ¶¶ 128–41.) In "Count III," Plaintiff asserts that "USDA's in-house adjudication violates the Seventh Amendment jury trial right." (Id. ¶¶ 142–62.) In "Count IV," Plaintiff asserts that "USDA's in-house adjudication violates Article III." (Id. ¶¶ 163–85.) Defendants dispute these constitutional infirmities, but both parties agree on all relevant facts.

A.  **Does the Judicial Officer Unconstitutionally Exercise Principal Officer Power?**

The appointment of government officers in the United States is dictated by Article II, Section 2 of the United States Constitution.

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

- 15 -

U.S. Const. art. II, § 2, cl. 2. In accordance with this clause, "inferior officers" may be appointed by either the President, courts of law, or heads of departments, but noninferior officers, referred to in modern parlance as "principal officers," may only be appointed by the President, with the advice and consent of the Senate. United States v. Arthrex, Inc., 594 U.S. 1, 12–13 (2021).

In Count I of his Complaint, Plaintiff asserts that the USDA's Judicial Officer "unconstitutionally exercises principal officer power." (Compl. (Doc. 1) ¶ 101.) Specifically, Plaintiff asserts that the USDA Secretary "delegated to the Judicial Officer the power to make all final decisions for USDA in adjudications under the HPA as if the Judicial Officer was the Secretary," (id. ¶ 103), that "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch," (id. ¶ 102 (quoting Arthrex, 594 U.S. at 23)), and that despite exercising principal officer power, the Judicial Officer was not appointed in the constitutional manner prescribed for principal officers, (id. ¶¶ 109–13). Defendants do not contest that the Judicial Officer may exercise final decision-making authority but contend that because the Judicial Officer is "removable at will and serves under the direction of the Secretary and under the supervision

- 16 -

of the Deputy Secretary," the Judicial Officer is "an inferior officer." (Defs.' Mem. (Doc. 27) at 15; see also Defs.' Suppl. Mem. (Doc. 49) at 5-7.) To determine whether the Judicial Officer's appointment by the Secretary is constitutionally valid, this court must determine whether the Judicial Officer exercises inferior or principal officer power.

"Inferior officers are most readily defined by their relationship to principal officers." Kennedy v. Braidwood Mgmt., Inc., 606 U.S. ---, 145 S. Ct. 2427, 2443 (2025). The Supreme Court has made clear that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." Edmond v. United States, 520 U.S. 651, 663 (1997); see also Braidwood, 145 S. Ct. at 2443 (explaining that Edmond "summarized the governing principle" between inferior and principal officers).

In Braidwood, the Supreme Court's most recent case on this issue, the Court considered the constitutionality of the U.S. Preventive Services Task Force, an entity within the Department of Health and Human Services ("HHS"), that "issues public recommendations about preventive healthcare services," some of which, following the passage of the Affordable Care Act of 2010, must be covered by health insurers at no cost to the insured.

- 17 -

145 S. Ct. at 2438. The court, in deciding whether the appointment of the Task Force members by the Secretary of HHS is consistent with the Appointment Clause, considered whether the Task Force members were principal or inferior officers. Id. at 2442.

In deciding this constitutional question, the Court reviewed its precedents to identify the key characteristics of inferior officers. First, the Court pointed to Edmond, where Coast Guard Court of Criminal Appeals judges were found to be inferior officers because "(i) the Judge Advocate General, who exercised administrative oversight over the judges, could remove them at will and (ii) the Court of Appeals for the Armed Forces could review and reverse their decisions." Id. at 2447 (citing Edmond, 520 U.S. at 664–65). Second, the Court pointed to Free Enterprise Fund, where it concluded that members of the Public Company Accounting Oversight Board ("PCAOB") were inferior officers, notwithstanding the fact that they were "'empowered to take significant enforcement actions . . . largely independently of the [Securities and Exchange] Commission,'" because they were removable at will. Id. (citing Free Enter. Fund, 561 U.S. at 504, 508–10). Third, the court pointed to Arthrex, where the Court, "after ensuring that the Director of the Patent and Trademark Office had authority to review final decisions issued

- 18 -

by Administrative Patent Judges, . . . deemed those judges to be inferior officers—even though they were removable only for cause." Id. (citing Arthrex, 594 U.S. at 16–17).

After reviewing its precedents, the Court in Braidwood held that members of the United States Preventive Services Task Force ("Task Force") were inferior officers. Id. at 2448. The Court explained its holding was "preordained" by its precedents given the "mutually reinforcing means by which the Secretary of [Health and Human Services] can supervise and direct the task force—namely, both the general authority to remove Task Force members at will and the more specific statutory authority to review and block their recommendations before they take effect." Id. at 2447.

In this case, the Secretary of Agriculture has the power to both remove the Judicial Officer at will and review and block the Judicial Officer's rulings before they take effect, and thus the conclusion that the Judicial Officer is an inferior officer is similarly "preordained." Additionally, beyond those methods of supervision and direction, the Judicial Officer is subject to extensive administrative oversight.

### 1. **At-Will Removal**

Here, the Judicial Officer is removable at will by the Secretary of Agriculture. See 7 U.S.C. § 2204-2 ("The Secretary

- 19 -

may at any time revoke the whole or any part of a delegation or designation made by him under this section.") The Court in Braidwood emphasized the importance of at-will removal in concluding that an officer is "inferior." The Court explained that "[a]n officer . . . who is removable at will by a principal officer . . . typically qualifies as an inferior officer." Braidwood, 145 S. Ct. at 2443. This is because "[a]n officer's presumed desire to avoid removal generally creates a here-and-now subservience" and thus, "[t]he prerogative of at-will removal of a subordinate . . . often carries with it the power to supervise and direct that subordinate." Id. (citations and internal quotation marks omitted); see also Edmond, 520 U.S. at 664 ("The power to remove officers . . . is a powerful tool for control.") In fact, the Court noted that it had not been directed by the parties to "any instance where an executive officer was removable at will by someone other than the President and nonetheless deemed a principal officer." Braidwood, 145 S. Ct. at 2444. The Court explained that "[t]he Secretary's authority to remove Task Force members at will in turn enables him to supervise and direct them." Id. Accordingly, the fact that the Judicial Officer may be removed at will by the Secretary of Agriculture weighs heavily in favor of finding him to be an inferior officer.

## 2.  **Reviewability**

The Court in Braidwood also explained that the HHS Secretary's "statutory power to directly review and block Task Force recommendations before they take effect . . . confirms that the Task Force members are inferior officers." Id. at 2445. The Court explained that the question of whether an officer has the "power to render a final decision on behalf of the United States without review by a principal officer . . . has taken on particular importance in assessing whether adjudicative officers are principal or inferior." Id.[2] (citations and internal quotation marks omitted). Notably, however, "to supervise and direct for purposes of the Appointments Clause, the Secretary need not review every decision. Rather, what matters is that the

_____

[2] The Court then noted that if "an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will." Braidwood, 145 S. Ct. at 2445. This statement suggests that, for inferior officer status, reviewability may be required only where an adjudicative officer may not be removed at will. This comports with dicta in Arthrex, where, having found that Administrative Patent Judges unconstitutionally exercised principal officer power by virtue of their final decision-making power and their for-cause removal protections, the Court expressly recognized that officers who issue final, unreviewable decisions, but are removable at will "are potentially distinguishable." See Arthrex, 594 U.S. at 20–21 ("Other examples are potentially distinguishable, such as the Benefits Review Board members who appear to serve at the pleasure of the appointing department head.").

Secretary have the <u>discretion</u> to review decisions rendered by the [inferior officer]." <u>Id.</u> at 2446 (cleaned up).

The Court held that the HHS Secretary had the discretion to review decisions rendered by the Task Force, specifically explaining that "[a] collection of statutes grants the Secretary general supervisory authority over the Task Force. That supervisory authority in turn enables the Secretary to review and, if he chooses, directly block a recommendation he disagrees with." <u>Id.</u>

The Court laid out the "complementary review authorities" as follows:

> <u>First</u>, 42 U.S.C. § 202 provides that the Public Health Service, which houses the Task Force, "shall be administered . . . under the supervision and direction of the Secretary."
>
> <u>Second</u>, Reorganization Plan No. 3 of 1966 grants the Secretary authority to perform "all functions of the Public Health Service" and its "officers," "employees," and "agencies." 80 Stat. 1610.
>
> <u>Third</u>, 42 U.S.C. § 300gg-92 states that the Secretary "may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter"—including the section of the Affordable Care Act that requires no-cost coverage of Task Force "A" and "B" recommendations.
>
> The Affordable Care Act mandates coverage without cost sharing of "evidence-based items or services that have <u>in effect</u> a rating of 'A' or 'B'" from the Task Force. § 300gg-13(a)(1) (emphasis added). During the minimum 1-year interval, the Secretary can use his general supervisory authority under § 202 and Reorganization Plan No. 3 to direct that the Task

Force's recommendation not be "in effect" and therefore not be binding on health insurers. Moreover, the Secretary can use his rulemaking authority under § 300gg-92 to establish a formal review process. For example, the Secretary can issue a regulation providing that no Task Force recommendation shall be deemed "in effect" until he or his designee has affirmatively reviewed and approved it.

Id. (internal footnote omitted). The Court concluded that "[t]aken together, those complementary review authorities ensure that the Task Force members 'have no power to render a final decision on behalf of the United States unless permitted to do so by' the Secretary of HHS." Id. (citation omitted). So too here. The Secretary of Agriculture has an arsenal of "complementary review authorities," which provide it the "discretion to review decisions rendered by" the inferior officer. Id.

First, while the Secretary has delegated the Judicial Officer the power to "[a]ct as final deciding officer in adjudicatory proceedings," 7 C.F.R. § 2.35(a); see also 7 U.S.C. § 2204-2, she has, in so doing, expressly retained her own ability to exercise that power. Federal regulations provide that "[n]o delegation of authority by the Secretary or a general officer contained in this part shall preclude the Secretary or general officer from exercising any of the authority so delegated." 7 C.F.R. § 2.12; see also id. § 2.27(a)(1) ("[N]o decision shall be final for purposes of judicial review except a

- 23 -

final decision of the Secretary upon appeal. As used herein, 'Secretary' means the Secretary of Agriculture, the Judicial Officer . . . ."). The Rules of Practice governing HPA adjudications, 7 C.F.R. §§ 1.130–1.51, recognize and reiterate that the Secretary's delegation of authority to the Judicial Officer does not prevent the Secretary herself from exercising that authority. See 7 C.F.R. § 1.132 ("Judicial Officer means an official of the [USDA] delegated authority by the Secretary of Agriculture . . . or the Secretary of Agriculture if the authority so delegated is exercised by the Secretary.").[3] Taken together, these authorities permit the Secretary to exercise her

---

[3] Plaintiff argues first that this provision states only that "[t]he Secretary is the final decision-maker if he has not delegated authority to the Judicial Officer." (Pl.'s Reply (Doc. 37) at 6.) But this conclusion is not supported by the text of the provision, which does not in any way suggest that the Secretary may only exercise her authority if not delegated. See 7 C.F.R. § 1.132 ("Judicial Officer means an official of the [USDA] delegated authority by the Secretary of Agriculture . . . or the Secretary of Agriculture if the authority so delegated is exercised by the Secretary." (emphasis added).

Further, Plaintiff argues that 7 C.F.R. § 1.132 is "merely a definitional provision that does not delegate or otherwise allocate power in USDA adjudications." (Pl.'s Reply (Doc. 37) at 6.) Even if the definitional provision does not itself "delegate or otherwise allocate power," by acknowledging that the Secretary may exercise delegated authority, the provision incorporates those regulations that do allocate power, see 7 C.F.R. §§ 2.12, 2.35(a), into the rules of practice and expressly puts regulated entities on notice that the Judicial Officer or the Secretary may be the final decision-making authority in their adjudication.

final decision-making power in the first instance, upon appeal from an ALJ decision, thereby excising the Judicial Officer altogether from the adjudicative process.

But assuming the Judicial Officer does exercise his delegated authority and renders a decision, the regulations permit the petitioning for rehearing, reargument, or reconsideration of the Judicial Officer's decision:

> A petition to rehear or reargue the proceeding or to reconsider the decision of the Judicial Officer shall be filed within 10 days after the date of service of such decision upon the party filing the petition. Every petition must state specifically the matters claimed to have been erroneously decided and alleged errors must be briefly stated.

7 C.F.R. § 1.146(a)(3). Accordingly, the Secretary could direct a petition for rehearing, reargument, or reconsideration to be filed and then exercise her authority to step into the role of final reviewing decisionmaker, rendering the Judicial Officer a penultimate decisionmaker. See In re: Apex Meat Co., 47 Agric. Dec. 557 (U.S.D.A. Mar. 4, 1988) (Secretary of Agriculture "assum[ing] direct authority for all further rulings and orders in this agency procedding [sic]" and "vacat[ing]" a stay order entered by the Judicial Officer). In sum, these authorities provide the Secretary with the discretion to both prevent the Judicial Officer from exercising final decision-making power in

- 25 -

the first instance and provide the Secretary the discretion to review a Judicial Officer's decision.

Plaintiff argues that the latter hypothetical pathway — the Secretary stepping in upon a petition for rehearing — violates 7 U.S.C. § 2204-3, which prevents the Secretary from retroactively revoking any delegation of her regulatory authority. (See Pl.'s Suppl. Mem. (Doc. 50) at 7-8.) This court disagrees. First, the Secretary need not revoke her delegation in order to step in and exercise final reviewing authority because she retains her regulatory authority to act as a final decisionmaker. See 7 C.F.R. § 2.12; id. § 1.132. But even if the Secretary's stepping in upon a petition for reconsideration was tantamount to "revoking" her delegation to the Judicial Officer, such a revocation is not "retroactive." This is because the Judicial Officer's decision "shall not be final for purposes of judicial review until the petition is denied or the decision is affirmed or modified pursuant to the petition." 7 C.F.R. § 1.146(b). In other words, the Secretary would only be revoking the Judicial Officer's authority prospectively, and such revocation would not

- 26 -

retroactively affect a final agency adjudication on the merits.[4]

Further, as Defendants argue, (Defs.' Suppl. Mem. (Doc. 49) at 7-8), to read 7 U.S.C. § 2204-3 as prohibiting the Secretary from reviewing the decisions of the Judicial Officer could

---

[4] Plaintiff additionally argues that if the Secretary were to exercise her power in this way, it would violate the Due Process Clause. (Pl.'s Reply (Doc. 37) at 5 (citing Utica Packing Co. v. Block, 781 F.2d 71 (6th Cir. 1986)).) There are two problems with this argument. First, this court has already explained that "[t]he facts and circumstances in Utica Packing were so unique that the court does not find that case to stand for the general proposition that a party's due process rights are violated each time the Secretary chooses to exercise the authority delegated to the Judicial Officer." (Doc. 21 at 16.) Second, this court is presently confronted only with the question of whether the statutes and regulations permit the Secretary of Agriculture the discretion to review the Judicial Officer's decisions. This court is not tasked with determining whether, if this discretionary review were in fact exercised, it would violate the Due Process Clause. Neither party has suggested that in this case the Secretary of Agriculture has or is likely to step in upon a petition for reconsideration of the Judicial Officer's decision. Accordingly, were this court to rule on the constitutionality of such an action, it would amount to an improper advisory opinion. Because that question is purely hypothetical on the facts presently before this court, this court declines to address it. See Ashcroft v. Mattis, 431 U.S. 171, 172 (1977) ("For a declaratory judgment to issue, there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'"); see also Trustgard Ins. Co. v. Collins, 942 F.3d 195, 199 (4th Cir. 2019) ("The irreducible constitutional minimum of standing requires the petitioner to allege a concrete injury that is actual or imminent, not conjectural or hypothetical." (citation and internal quotation marks omitted)).

undermine[5] the constitutionality of the current appointment scheme—a point at which Braidwood urges the invocation of constitutional avoidance. Braidwood, 145 S. Ct. at 2460-61 ("Rather than read the statute in a manner that would render it clearly unconstitutional," courts should "adopt[] a reasonable alternative reading." (cleaned up)); see also Jennings v. Rodriguez, 583 U.S. 281, 285 ("Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts . . . .").

Plaintiff argues that "[n]othing in 7 C.F.R. § 1.146 permits the Secretary to decide a rehearing petition." (Pl.'s Reply (Doc. 37) at 5.) This court disagrees — 7 C.F.R. § 1.146 explains that petitions for rehearing, reargument, or reconsideration of the Judicial Officer's decision "shall be ruled upon by the Judicial Officer." 7 C.F.R. § 1.146(a)(1). And as explained above, the definitional provision applicable to § 1.146 explains that the term "Judicial Officer" includes "the Secretary of Agriculture if the authority so delegated is exercised by the Secretary." Id. § 1.132. Taken together, the

---

[5] As discussed supra n.2, it is not settled by the Supreme Court's precedents whether the absence of reviewability would render the Judicial Officer's appointment as an inferior officer unconstitutional.

regulations clearly permit the Secretary herself to decide a petition for rehearing, reargument, or reconsideration.

In sum, considering all of the aforementioned authorities, the Secretary has both the discretion to step into the role of the Judicial Officer in the first instance and has the discretion to step in and review a Judicial Officer's decision. These review tools are sufficient to render the Judicial Officer an "inferior" officer. See Arthrex, 594 U.S. at 25 ("If the Director were to have the 'authority to take control' of a [Patent Trial and Appeal Board] proceeding, [Administrative Patent Judges] would properly function as inferior officers."); Braidwood, 145 S. Ct. at 2446 ("[T]o supervise and direct for purposes of the Appointments Clause, the Secretary 'need not review every decision,'" but rather must "'have the discretion to review decisions rendered by'" inferior officers. (citations omitted)).

Even if this court were to find that the Secretary is restricted from reviewing the Judicial Officer's decisions, it is a restriction imposed by and within the full control of the Secretary herself. The Judicial Officer is delegated final decision-making power by regulation. The Secretary of Agriculture can, at any time, prospectively revoke the delegation of final decision-making power, see 7 U.S.C. § 2204-

- 29 -

2, by using her rulemaking authority under 5 U.S.C. § 553 to amend 7 C.F.R. § 2.35, which defines the Secretary's delegation of duties. In this way, the case at hand is distinct from Arthrex, where the Patent Trial and Appeal Board ("PTAB") had final, unreviewable decision-making power pursuant to statute. See 35 U.S.C. § 6(c) ("Only the Patent Trial and Appeal Board may grant rehearings."). There, Congress foreclosed the possibility of a Presidentially appointed and Senate confirmed officer to ever review PTAB decisions. The Supreme Court in Arthrex expressly acknowledged this factual distinction, noting that the Government's "handful of contemporary officers who are appointed by heads of departments but who nevertheless purportedly exercise final decisionmaking authority," were distinguishable because "[s]everal [of those examples] . . . involve inferior officers whose decisions a superior executive officer can . . . implement a system for reviewing." Arthrex, 594 U.S. at 20.

Although the Secretary's revocation of her delegated power could not vitiate prior final decisions issued by a Judicial Officer, see 7 U.S.C. § 2204-3 ("A revocation of delegation shall not be retroactive . . . ."), the Secretary does retain the ability to alter the review structure going forward, a power not available to principal officers in Arthrex. This prospective

- 30 -

supervisory power is analogous to the HHS Secretary's power in
Braidwood to "use his rulemaking authority . . . to establish a
formal review process," which the Court identified as one of the
Secretary's "complementary review authorities," which taken
together, "ensure[d] that the Task Force members 'have no power
to render a final decision on behalf of the United States unless
permitted to do so by' the Secretary of HHS." See Braidwood, 145
S. Ct. at 2446 (citation omitted). So too here, the Judicial
Officer's final decision-making power is at the whim of the
Secretary's regulatory authority, and thus he has "no power to
render a final decision on behalf of the United States unless
permitted to do so by" the Secretary of Agriculture.

### 3. Additional Methods of Supervision and Direction

Finally, beyond the dispositive facts that the Judicial
Officer is removable at will and subject to the review of the
Secretary, the Judicial Officer is also subject to other methods
of "supervision and direction" by the Secretary that confirm his
status as an inferior officer. See id. at 2461. The Judicial
Officer is bound by the USDA Rules of Practice, 7 C.F.R. §
1.131, which the Secretary has the power to amend, see 5 U.S.C.
§§ 301, 553, and the substantive regulations implementing the
HPA, 9 C.F.R. § 11.1 et seq., which the Secretary is tasked with
promulgating, see 15 U.S.C. § 1828. The Judicial Officer's

- 31 -

performance is also evaluated annually by the Deputy Secretary, (see Defs.' Ex. A, Knowles Decl. (Doc. 27-1) ¶ 3), who is appointed by the President and confirmed by the Senate, 7 U.S.C. § 2210. The Judicial Officer is required, by regulation, to notify the Secretary if he intends to apply "new principles of major importance or a departure from principles established by the Secretary." 7 C.F.R. § 2.11; see also id. § 2.4.

Additionally, by statute, the Secretary is empowered, in her discretion, to "compromise, modify, or remit, with or without conditions, any civil penalty assessed" following an administrative adjudication under the Horse Protection Act. See 15 U.S.C. § 1825(b)(4). The Secretary has not delegated this statutory power. See generally 7 C.F.R. § 2.1 et seq. Therefore, even where the Secretary permits the Judicial Officer's decision to become final, she can, without restriction, alter or remit the monetary penalty associated with the Judicial Officer's

decision.[6]

In sum, taking the Secretary of Agriculture's "removal and review authorities together, the inferior-officer issue is quite straightforward under Edmond, Free Enterprise Fund, and Arthrex." Braidwood, 145 S. Ct. at 2448. Because the Secretary of Agriculture may "supervise and direct" the Judicial Officer by her "general authority to remove [the Judicial Officer] at will" and her statutory and regulatory authority to prevent the Judicial Officer from acting as a final decisionmaker and to review the decisions he does render, this court finds the Judicial Officer is an inferior officer. See id. at 2447. Thus, he need not have been nominated by the President and confirmed by the Senate and instead could appropriately be appointed by the head of an executive department, such as the Secretary of Agriculture.

**B.** **Is the Office of the Judicial Officer "Established by Law"?**

The Appointments Clause provides that the President

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court,

---

[6] It does not appear that the Secretary has the power to revise or alter any period of disqualification from participating in the horse showing industry that a Judicial Officer could impose, however. See generally 15 U.S.C. § 1825(c).

and all other Officers of the United States, whose
Appointments are not herein otherwise provided for,
and which shall be established by Law: but the
Congress may by Law vest the Appointment of such
inferior Officers, as they think proper, in the
President alone, in the Courts of Law, or in the Heads
of Departments.

U.S. Const. art. II, § 2, cl. 2. To qualify as an officer, as
opposed to a mere employee, an individual must occupy a
"'continuing' position established by law." Lucia v. Sec. &
Exch. Comm'n, 585 U.S. 237, 245 (2018) (emphasis added)
(citation omitted). The parties agree that 7 U.S.C. § 2204-2
authorizes the Secretary of Agriculture's delegation of
regulatory authority but disagree as to whether it establishes
the role of the Judicial Officer in accordance with the
Appointments Clause. 7 U.S.C. § 2204-2 reads as follows:

Whenever the Secretary of Agriculture deems that the
delegation of the whole or any part of any regulatory
function which the Secretary is . . . required or
authorized to perform will result in the more
expeditious discharge of the duties of the Department
of Agriculture, he is authorized to make such
delegation to any officer or employee designated under
this section. The Secretary is authorized to designate
officers or employees of the Department to whom
functions may be delegated under this section and to
assign appropriate titles to such officers or
employees. There shall not be in the Department at any
one time more than two officers or employees
designated under this section and vested with
a regulatory function or part thereof delegated under
this section. . . .

7 U.S.C. § 2204-2.

- 34 -

First, Plaintiff argues that, contrary to the dictates of the Appointments Clause, the office of the Judicial Officer is not "established by law" because no statute contains the "duties, salary, and means of appointment" for the Judicial Officer. (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 23–24.) Second, Plaintiff argues that 7 U.S.C. § 2204-2 was not intended to "establish by law" a new office because it uses the word "designate," thus only permitting the Secretary to delegate regulatory authority to <u>preexisting</u> officers or employees of the USDA. (<u>Id.</u>)

### i. <u>Duties, Salary, and Means of Appointment</u>

Plaintiff argues that "[f]or an office to be 'established by Law' pursuant to the Appointments Clause, it must be 'created by statute, down to its "duties, salary, and means of appointment,"'" and that no such statute establishes the role of the Judicial Officer in this way. (<u>Id.</u> at 23 (quoting <u>Lucia</u>, 585 U.S. at 247–48; citing <u>Burnap v. United States</u>, 252 U.S. 512, 516–18 (1920)).) Defendants disagree, contending that "[n]othing in <u>Lucia</u> requires that an inferior officer 'must' have duties, salary and means of appointment created by statute," and that <u>Burnap</u> instructs only that "whether an individual is an officer 'is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties

and appointment thereto.'" (Defs.' Reply & Resp. in Opp'n (Doc. 36) at 8 (citations omitted).)

This court agrees with Defendants. Plaintiff has pointed to no binding precedent to support a conclusion that the Appointments Clause requires a statute to articulate the "duties, salary and means of appointment" to properly "establish by law" an inferior office. In Lucia, the Court analyzed whether Securities and Exchange Commission ALJs were government officers as opposed to mere employees. Lucia, 585 U.S. at 244. In finding the ALJs were officers, Lucia emphasized that "[f]ar from serving temporarily or episodically, SEC ALJs 'receive[] a career appointment.' And that appointment is to a position created by statute down to its 'duties, salary, and means of appointment.'" Id. at 248 (citations omitted). But Lucia does not mandate the inclusion of the "duties, salary, and means of appointment," for an office to be "established by law." All parties in Lucia agreed that these ALJs held a continuing office "established by law," so that issue was not in dispute. Id. at 247. The Court's recognition that the ALJs' appointment was to "a position created by statute, down to its 'duties, salary, and means of appointment,'" id. at 248, was a factor considered by the Lucia court in determining whether the ALJ was an officer as

- 36 -

opposed to an employee but was not declared a mandatory statutory feature to establish an office by law.

This interpretation of <u>Lucia</u> is supported by <u>Freytag v. Commissioner of Internal Revenue</u>, the case from which the language "duties, salary, and means of appointment" originates. <u>See</u> 501 U.S. 868, 881 (1991). In <u>Freytag</u>, the Court, in determining whether special trial judges of the Tax Court were officers or employees, stated that "[t]he office of special trial judge is 'established by Law,' . . . , <u>and</u> the duties, salary, and means of appointment for that office are specified by statute." <u>Id.</u> (emphasis added) (citing <u>Burnap</u>, 252 U.S. at 516–17). The inclusion of "and" suggests that "duties, salary, and means of appointment" were not mandatory prerequisites to "established by law," but rather were factors relevant to the court's guiding question in that case — whether the special trial judges were employees or inferior officers. <u>See id.</u>; <u>see also Lucia</u>, 585 U.S. at 253 (Thomas, J., concurring) ("While precedents like <u>Freytag</u> discuss what is <u>sufficient</u> to make someone an officer of the United States, our precedents have never clearly defined what is <u>necessary</u>.")

To the extent that Plaintiff takes umbrage with the fact that the role "Judicial Officer" is not specifically mentioned within 7 U.S.C. § 2204-2, this court finds <u>Commonwealth of</u>

_Pennsylvania v. United States Department of Health & Human_
_Services_, 80 F.3d 796, 804-05 (3d Cir. 1996), particularly
persuasive. There, the court found a statute conferring broad
authority upon the Secretary of Health and Human Services to
"appoint and fix the compensation of such officers and employees
and to make such expenditures as may be necessary for carrying
out the functions of the Secretary under this chapter"
constituted an act of Congress authorizing the appointment of
HHS Appeals Board members, despite the fact that their positions
were not specifically named in any act of Congress. _Id._ The
court explained that "Congress gave the Secretary [of Health and
Human Services] carte blanche to appoint individuals to assist
her in carrying out [her] duties" and that this grant of
appointment authority does not run contrary to the Appointments
Clause, because the Clause "does not require that a law
specifically provide for the appointment of a particular
inferior officer." _Id._ at 804-05.

The court explained that this conclusion was dictated by
the "flexibility . . . thought appropriate in providing for the
appointment of officers who, by definition, would have only
inferior governmental authority." _Id._ at 805 (quoting _Weiss v._
_United States_, 510 U.S. 163, 186-87 (1994) (Souter, J.,
concurring)). This flexibility would be frustrated "if [the

- 38 -

court] were to require Congress to account for every potential inferior officer appointment in its statutory grant of authority to the department head." Id.

This court agrees with the reasoning of Pennsylvania v. HHS and finds that the Appointments Clause is not violated where "Congress gave the Secretary [of Agriculture] carte blanche[7] to appoint individuals to assist her in carrying out [her] duties," and she has properly exercised that authority by passing regulations which create the office of the Judicial Officer.[8] See id.; see also Willy v. Admin. Rev. Bd., 423 F.3d 483, 491-92 (5th Cir. 2005) (finding "broad language employed by Congress . . . vests the Secretary [of Labor] with ample authority to create the [Administrative Review Board], appoint its members,

---

[7] Congress did not afford the Secretary of Agriculture limitless appointment authority. See 7 U.S.C. § 2204-2 ("There shall not be in the Department at any one time more than two officers or employees designated under this section and vested with a regulatory function or part thereof delegated under this section.").

[8] Even Justice Thomas, in expressing his belief that the Constitution's requirement of offices "established by Law" is not a "trifling technicality," implied that a broad statutory grant of appointment authority may be sufficient under the Appointments Clause. See Trump v. United States, 603 U.S. 593, 648, 650 (2024) (Thomas, J., concurring) (explaining that it was "difficult to see how the Special Counsel has an office 'established by Law,'" where the Attorney General, who appointed the Special Counsel, "did not identify any statute that clearly creates such an office," nor "rely on a statute granting him the authority to appoint officers as he deems fit, as the heads of other agencies have").

and delegate final decision-making authority to them"); Edmond, 520 U.S. at 656 (finding a statute permitting the Secretary of Transportation to "appoint and fix the pay of officers and employees of the Department of Transportation and . . . prescribe their duties and powers" sufficient to give the Secretary the power to appoint judges of the Coast Guard Court of Criminal Appeals despite the fact that "the statute does not specifically mention" them).

### ii. "Designate" vs. "Appoint"

Next, Plaintiff argues that 7 U.S.C. § 2204-2 does not establish the role of Judicial Officer "by law" because "[t]he statutes pursuant to which the Judicial Officer was delegated power only authorize the delegation of authority to existing officers of the department." (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 23 (citing 7 U.S.C. § 2204-2; Reorganization Plan No. 2 of 1953, 18 Fed. Reg. 3219, 3221 (June 5, 1953), reprinted as amended in 5 U.S.C. app. 1 at 145–46).) To support this argument, Plaintiff urges this court to interpret the word "designate" within the statute to require the Secretary to "cede her adjudicative authority to officers previously created by Congress," permitting her only to "identify to whom adjudicative power can be delegated, which is those already within USDA." (Pl.'s Suppl. Mem. (Doc. 50) at 14,

- 40 -

15.) Plaintiff argues that its interpretation is supported by the statute's legislative history, explaining that "Congress affirmatively decided not to create a new office within USDA when it enacted section 2204-2." (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 24 (citing In Re: World Wide Citrus, 50 Agric. Dec. 319, 335-44 (U.S.D.A. May 9, 1991)).)

Plaintiff's interpretation of the statute is unpersuasive for several reasons. First, the Supreme Court has recently explained that "Congress need not use magic words to confer appointment authority," and in fact, "[a]round the time of the Founding, the verb appoint was synonymous with allot, assign, or designate." Braidwood, 145 S. Ct. at 2454 (emphasis added) (internal quotation marks and citations omitted). Plaintiff acknowledges Braidwood's instruction but still contends that "the word 'designate' here must still be read in its context," and according to Plaintiff, the context of the statute permits the Secretary only to "identify to whom adjudicative power can be delegated, which is those already within USDA." (Pl.'s Suppl.

Mem. (Doc. 50) at 14, 15.)[9] This court disagrees. The plain
meaning of the statute, giving the historical meaning of
"designate"[10] is clear: the Secretary of Agriculture may
"[appoint] officers or employees of the Department to whom
functions may be delegated under this section" and the Secretary
may "assign appropriate titles to such officers or employees." 7
U.S.C. § 2204-2. In other words, the statute authorizes the
Secretary to appoint individuals to act as either officers or
employees in the USDA, assign them titles, for example,
"Judicial Officer," and delegate to them regulatory authority.
Nothing in the statute suggests the Secretary may only delegate
to preexisting USDA officers or employees. And in fact, the

---

[9] Plaintiff cites Edmond for the proposition that "[t]he
power to designate preexisting officers or employees to exercise
delegated authority is distinct from the power to appoint
officers in the first instance." (Pl.'s Resp. in Opp'n & Mem. in
Supp. of Summ. J. (Doc. 33) at 23-24 (citing Edmond, 520 U.S. at
657).) But Edmond is distinct because there, the court
acknowledged that "Congress has consistently used the word
'appoint' with respect to military positions requiring a
separate appointment, rather than using terms not found within
the Appointments Clause, such as 'assign.'" 520 U.S. at 657-58
(citation omitted). No such similar "consistent[]" use of the
term "appoint" has been introduced by Plaintiff in the USDA
context.

explicit authority to "assign titles" further supports that the Secretary is entitled to create new positions within the Department in exercising this statutory authority. <u>See</u> <u>id.</u>

Although Plaintiff also cites to legislative history, because this court finds the plain language of the statute clear, it need not consider legislative history. <u>See</u> <u>Dep't of Hous. & Urb. Dev. v. Rucker</u>, 535 U.S. 125, 132 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."). Courts "do not resort to legislative history to cloud a statutory text that is clear," even where there are "contrary indications in the statute's

---

[10] Even today in 2025, "appoint" is a listed synonym for the verb "designate" in Merriam-Webster's Dictionary. <u>See</u> <u>Designate</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/designate (last visited August 9, 2025); <u>see</u> <u>also</u> <u>Designate</u>, <u>Black's Law Dictionary</u> (12th ed. 2024) ("To choose (someone or something) for a particular job or purpose.").

- 43 -

legislative history." <u>Ratzlaf v. United States</u>, 510 U.S. 135, 147–48 (1994).[11]

Put simply, § 2204-2 permits the Secretary to designate no more than two officers or employees to whom the Secretary may delegate some of her own regulatory functions and may assign titles as such. The Secretary has done just that — she has, by regulation, designated one individual to whom she delegates her final decision-making adjudicatory authority and has assigned him the title "Judicial Officer." 7 C.F.R. § 2.35. This court finds that, in accordance with the requirements of the Appointments Clause, 7 U.S.C. § 2204-2 establishes the role of Judicial Officer and provides for his appointment in the Secretary of Agriculture. To hold otherwise would run contrary to the "flexibility" that was "thought appropriate in providing for the appointment of officers who, by definition, would have

---

[11] Even if Plaintiff's interpretation of the statute were correct, that § 2204-2 "merely allows the Secretary to 'designate' already existing 'officers or employees <u>of the Department</u>' to exercise certain delegated authority," (Pl.'s Reply (Doc. 37) at 8), the statute still creates a new role — that of the Secretary's chosen delegate. Whether the Secretary is limited to filling that role by appointing a preexisting USDA employee or not has no apparent bearing on whether or not the role itself is "established by law" within the meaning of the Constitution, nor has Plaintiff has put forth caselaw suggesting otherwise.

only inferior governmental authority." <u>Weiss</u>, 510 U.S. at 186-87 (Souter, J., concurring).

C. <u>**Are the USDA ALJs Properly Supervised by a Principal Officer?**</u>

Plaintiff also asserts that, if the Judicial Officer is an inferior officer, then the USDA ALJs are not supervised by a properly appointed officer, because "[i]n agency adjudications, principal officer supervision must include the ability to review the decisions of an inferior officer." (Compl. (Doc. 1) ¶¶ 123-24.) Because "[i]nitial decisions of ALJs in HPA adjudications are appealable only to USDA's Judicial Officer, who issues final decisions for USDA," Plaintiff asserts that the ALJs "lack principal officer supervision, which is unconstitutional." (<u>Id.</u> ¶¶ 125, 27.)

As an initial matter, as this court has explained, it is not clear whether principal officer supervision in the agency adjudication setting always requires reviewability. <u>See</u> <u>supra</u> n.2. However, because the ALJs are only removable for cause, <u>see</u> 5 U.S.C. § 7521, Supreme Court precedent suggests reviewability is required. <u>See</u> <u>Braidwood</u>, 145 S. Ct. at 2445 ("If an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will." (citing <u>Arthrex</u>, 594 U.S. at 16-17)).

- 45 -

But here the ALJs are properly supervised by a superior principal officer, the Secretary of Agriculture. This court has already explained that the Secretary of Agriculture has the discretion to completely excise the Judicial Officer from the adjudicative process and herself directly review the ALJ decisions and has the discretion to review the Judicial Officer's decisions. See supra Section V.A. Accordingly, this argument is without merit and this court finds that the USDA ALJs are properly supervised by the Secretary of Agriculture, a principal officer.[12]

### D.   Are USDA ALJs' Removal Protections Unconstitutional?

ALJs are appointed under 5 U.S.C. § 3105 and may be removed only "for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521. Members of the Merit Systems Protection Board ("MSPB"), in turn, may only be removed by the President for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). Plaintiff seeks a declaratory judgment that "USDA's dual-layer tenure protection

---

[12] Also, for the same reasons discussed supra n.4, Plaintiff's argument that any "ad hoc intervention" by the Secretary would violate the due process clause is without merit. (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 25.)

violates the United States Constitution's separation of powers in Article II; and a permanent injunction of the pending administrative enforcement proceeding against [him]." (Compl. (Doc. 1) ¶ 188.)

Plaintiff asserts that these removal protections, which protect the USDA ALJ who presided over his administrative adjudication, violate the Constitution. (Id. ¶¶ 128–41.) Plaintiff argues that "USDA ALJs, as inferior officers who manage administrative hearings, 'exercise significant executive power' such that the President's removal authority cannot be restricted by two layers of tenure protection." (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 26 (citations omitted).) In support of this argument, Plaintiff relies primarily on Free Enterprise Fund v. Public Co. Accounting Oversight Board, 561 U.S. 477 (2010).

In Free Enterprise Fund, the Court evaluated the constitutionality of the structure of the Public Company Accounting Oversight Board ("PCAOB"), a subagency within the Securities and Exchange Commission. The Commission could only remove PCAOB members for "good cause shown" and "'in accordance with' certain procedures." Id. at 486 (citation omitted). Members of the Commission, in turn, could only be removed by the President for "inefficiency, neglect of duty, or malfeasance in

- 47 -

office." Id. at 487. The Court held that the "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." Id. at 492. The Court made clear, however, that its holding "does not address that subset of independent agency employees who serve as administrative law judges." Id. at 507 n.10.

The Supreme Court has recognized the ability of "private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President." Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 212 (2020). This is because "when [a removal] provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." Id. (citation omitted).

Whether the removal restrictions that protect ALJs are in fact unconstitutional is an unsettled question of law. See K & R Contractors, LLC v. Keene, 86 F.4th 135, 148 (4th Cir. 2023) (addressing circuit split on this issue but not resolving). But even if the ALJ removal restrictions are unconstitutional, it does not necessarily follow that any one ALJ's actions are improper. This is because "the actions of a lawfully appointed executive officer fulfilling the duties of his office are

legitimate and enforceable, even if the President's authority to remove the officer was unconstitutionally limited during his tenure." Id. at 149; see also Nat'l Lab. Rels. Bd. v. Starbucks Corp., 125 F.4th 78, 87 (3d Cir. 2024) (explaining that a challenge to removal protections "does not call into question the ALJ's or the [Agency's] core authority to act"). And as discussed above, supra Section V.C., USDA ALJs, such as the ALJ who presided over Plaintiff's agency adjudication, are properly supervised inferior officers, lawfully appointed by the Secretary of Agriculture, see 5 U.S.C. § 3105, and thus when those ALJs "fulfill[] the duties of [their] office" those actions are "legitimate and enforceable," see K & R Contractors, LLC, 86 F.4th at 149.

To contend otherwise—that the actions of those ALJs allegedly improperly protected by removal restrictions are illegitimate and unenforceable—and to thereby obtain retrospective relief based on having been subjected to those actions, a plaintiff must show that the removal restriction inflicted "compensable harm" upon them. See Collins v. Yellen, 594 U.S. 220, 259 (2021). For example, a court could find compensable harm where "the President had attempted to remove [an agency official] but was prevented from doing so by a lower court decision holding that he did not have 'cause' for

- 49 -

removal," or where "the President had made a public statement expressing displeasure with actions taken by [an agency official] and had asserted that he would remove the [agency official] if the statute did not stand in the way." Id. at 259–60.

The parties dispute whether Collins's requirement of a showing of "compensable harm" is required for prospective relief. (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 28–29; Defs.' Reply & Resp. in Opp'n (Doc. 36) at 11.) According to Plaintiff, Collins addresses only retrospective relief and thus does not impact his ability to seek prospective relief. (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 28–29.) There are two problems with Plaintiff's argument. First, his adjudication before the ALJ has concluded, (see Doc. 42 at 2), thereby his request for injunctive relief insofar as it seeks to halt the adjudication before the ALJ is moot and his request for a declaratory judgment that such adjudication

violated the constitution appears to now be retrospective.[13] (See Compl. (Doc. 1) ¶ 188.)

Second, even if those forms of relief could be construed as prospective, many circuit courts have held that Collins's required showing of "compensable harm" in order to obtain relief based on unconstitutional removal restrictions applies equally to both retrospective and prospective relief, and this court finds those circuit courts' reasoning to be persuasive. See Leachco, Inc. v. Consumer Prod. Safety Comm'n, 103 F.4th 748, 757 (10th Cir. 2024); see also Calcutt v. Fed. Deposit Ins. Corp., 37 F.4th 293, 316 (6th Cir. 2022), cert. granted, opinion rev'd on other grounds, 598 U.S. 623 (2023) ("The Collins inquiry focuses on whether a 'harm' occurred that would create an entitlement to a remedy, rather than the nature of the remedy, and our determination as to whether an unconstitutional removal protection 'inflicted harm' remains the same whether the

_____

[13] The USDA Judicial Officer, in granting Plaintiff's request for a stay of the agency adjudication, found that "the ALJ erred by resolving the merits and imposing sanctions rather than allow the federal court to first address the jurisdictional challenges raised against proceedings in an administrative tribunal." (Pl.'s Ex. A, Stay Order (Doc. 50-1) at 5.) But neither Plaintiff nor the order of the USDA Judicial Officer suggests that the ALJ will have any further role in Plaintiff's adjudication. Thus, while the adjudicatory proceeding remains ongoing, (see id.), a review of the actions of the ALJ's role in that proceeding is now retrospective.

petitioner seeks retrospective or prospective relief
(particularly when we review an adjudication that has already
ended).”); Cmty. Fin. Servs. Ass’n of Am., Ltd. v. Consumer Fin.
Prot. Bureau, 51 F.4th 616, 631 (5th Cir. 2022), rev’d and
remanded on other grounds, 601 U.S. 416 (2024) (“Collins did not
rest on a distinction between prospective and retrospective
relief.”); Consumer Fin. Prot. Bureau v. L. Offs. of Crystal
Moroney, P.C., 63 F.4th 174, 180–81 (2d Cir. 2023), cert.
denied, 144 S. Ct. 2579 (2024) (“The petitioners’ only ‘live
claim’ before the Supreme Court in Collins was for retrospective
relief, and so that is all the Supreme Court addressed. But the
Supreme Court’s reasoning that an officer’s actions are valid so
long as she was validly appointed applies with equal force
regardless of the relief sought by the party challenging the

officer's actions." (internal citation omitted)).[14]

Because Plaintiff does not put forth any evidence that he has suffered a "compensable harm" entitling him to his requested relief on this claim, his claim must be dismissed. Cf. K & R Contractors, 86 F.4th at 149–150 (refusing to decide the constitutional question and denying petition for review of ALJ adjudication where the plaintiff did not assert "any possible harm resulting from the allegedly unconstitutional limitations on the President's ability to remove DOL ALJs"). This court declines to reach the constitutional question of whether the USDA ALJ removal protections are unconstitutional because in the absence of possible relief for Plaintiff, the question becomes

---

[14] Plaintiff attempts to bolster his argument by citing to Axon Enterprise, Inc. v. Federal Trade Commission, 598 U.S. 175, 185 (2023), for the proposition that the harm at issue here is his "being subjected 'to an illegitimate proceeding, led by an illegitimate decisionmaker.'" (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 29.) But Axon is not relevant to the question of whether Collins' relief analysis applies to prospective relief, as Axon addressed only "the question of a district court's jurisdiction when no agency proceedings had taken place." Nat'l Lab. Rels. Bd. v. Starbucks Corp., 125 F.4th 78, 88 (3d Cir. 2024); see also YAPP USA Auto. Sys., Inc. v. Nat'l Lab. Rels. Bd., No. 24-1754, 2024 WL 4489598, at *3 (6th Cir. Oct. 13, 2024) ("Axon 'did not address issues of relief or injury.'"). This interpretation is consistent with the Fourth Circuit's discussion of Axon in its order addressing Plaintiff's appeal of this court's order denying the motion for preliminary injunction. (See Doc. 52 at 11 ("At most, Axon holds that a litigant can pursue a federal court challenge to an allegedly unconstitutionally structured agency proceeding while the proceeding remains before the agency").)

"wholly academic" and "the judicial restraint principles of constitutional avoidance" convince this court to "not answer it." See Wright v. Comm'r of Internal Rev., No. 24-10563, 2025 WL 2167378, at *4 (11th Cir. July 31, 2025) (quoting Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1291 (11th Cir. 2021)).

**E.    Does the Administrative Complaint Against Plaintiff Need to be Brought in Federal Court Before a Jury?**

Plaintiff asserts that the HPA action against him must have 1) been brought in an Article III court and 2) heard before a jury pursuant to the Seventh Amendment.[15] (Compl. (Doc. 1) ¶¶ 142–85.) The Supreme Court recently addressed both questions in Securities and Exchange Commission v. Jarkesy, 603 U.S. 109 (2024). In Jarkesy, the SEC brought an in-house agency enforcement action against Mr. Jarkesy and his investment firm, Patriot28, LLC, "seeking civil penalties for alleged securities fraud." Id. at 115.

The Court first addressed what it considered "[t]he threshold issue," — "whether this action implicates the Seventh Amendment." Id. at 120. The court explained that the Seventh

---

[15] The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII.

Amendment applies to statutory claims that are "legal in nature," and "[t]o determine whether a suit is legal in nature," courts are directed to "consider the cause of action and the remedy it provides," although "the remedy [is] the 'more important' consideration." Id. at 122–23 (citations omitted). In Jarkesy, the court found that the SEC fraud action was "legal in nature" within the meaning of the Seventh Amendment because 1) "the SEC seeks civil penalties," which are "a type of remedy at common law that could only be enforced in courts of law" and which were tied to the culpability of the wrongdoer, and 2) because the SEC fraud cause of action bore a close relationship to an action for common law fraud. Id. at 123–26.

After finding the Seventh Amendment implicated, the Court then considered whether the "public rights" exception applied. Id. at 127. The public rights exception permits actions to be removed from Article III courts,[16] notwithstanding the application of the Seventh Amendment. See id.; see also

───────────

[16] Article III provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Given the Founders' intention to maintain the independence of the judiciary, the Supreme Court has held that "in general, Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" Stern v. Marshall, 564 U.S. 462, 484 (2011) (citation omitted).

Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 53–54 (1989)
("[I]f Congress may assign the adjudication of a statutory cause
of action to a non-Article III tribunal, then the Seventh
Amendment poses no independent bar to the adjudication of that
action by a nonjury factfinder."). The public rights doctrine
must be treated by courts "with care," as it is "after all, an
exception," Jarkesy, 603 U.S. at 131, and the presumption is in
favor of Article III adjudication, id. at 132.

The current jurisprudence appears to embrace two pathways
which may qualify a cause of action for non-Article III
adjudication under the public rights exception. First, falling
within the public rights exception are those cases which
"historically could have been determined exclusively by [the
executive and legislative branches]," such as: the collection of
revenue, immigration, tariffs associated with goods imported by
"unfair methods of competition," relations with Indian tribes,
the administration of public lands, the granting of public
benefits, and patent rights. Id. at 128–131 (outlining
jurisprudence). Second, claims which are "unknown to the common
law" fall within the public rights exception. Id. at 137–38
("Atlas Roofing concluded that Congress could assign the OSH Act
adjudications to an agency because the claims were 'unknown to
the common law.'" (quoting Atlas Roofing Co., Inc. v.

Occupational Safety & Health Rev. Comm'n, 430 U.S. 442, 461 (1977))); Axalta Coating Sys. LLC v. Fed. Aviation Admin., --- F.4th ---, No. 23-2376, 2025 WL 1934352, at *4 (3d Cir. July 15, 2025) (explaining that the Court in Jarkesy "distinguished, but did not overrule, its holding in Atlas Roofing").

The Court in Jarkesy held that the public rights exception did not apply to the SEC enforcement action because the "substance of the action . . . target[ed] the same basic conduct as common law fraud, employ[ed] the same terms of art, and operate[ed] pursuant to similar legal principles." Jarkesy, 603 U.S. at 134. And, as described above, the Court reiterated that the SEC antifraud provisions "provide civil penalties, a punitive remedy that . . . 'could only be enforced in courts of law.'" Id. (citation omitted). But the court did not hold that civil penalties necessarily forbid the application of the public rights exception, and in fact expressly distinguished its holding from Atlas Roofing, where the Court upheld the non-Article III adjudication of OSHA regulations, even though "[i]f a party violated the regulations, the agency could impose civil penalties." Id. at 136 (citing Atlas Roofing, 430 U.S. at 446).

The Jarkesy court explained that the public rights exception as applied in Atlas Roofing was distinct from the SEC securities fraud action because "the OSH Act did not borrow its

- 57 -

cause of action from the common law," but rather, required employers to comply with regulatory standards that "bring no common law soil with them." Id. at 136–37.

> The purpose of [the OSHA] regime was not to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law. Rather, Congress stated that it intended the agency to "develop[] innovative methods, techniques, and approaches for dealing with occupational safety and health problems." In both concept and execution, the Act was self-consciously novel.

Id. at 137 (internal citation omitted). The Court in Jarkesy concluded that Atlas Roofing "does not control here" where the SEC securities fraud action "is in the nature of a common law suit." Id. at 138 (citation and internal quotation marks omitted).

But in the case before this court, Atlas Roofing controls. Even assuming the Seventh Amendment applies to the HPA enforcement action, this court is satisfied that the action may properly be "determined exclusively by [the USDA]," see id. at 128, pursuant to the public rights exception. Although the HPA action does not appear to fit within a recognized historical public rights exception, it is, like Atlas Roofing, a cause of action that brings with it "no common law soil." Jarkesy, 603 U.S. at 137. Cf. Axalta Coating Sys. LLC, 2025 WL 1934352, at *4 (finding the public rights exception applied to a Federal Aviation Administration enforcement action because it "cannot be

- 58 -

distinguished from the enforcement action considered in <u>Atlas Roofing</u>").

   Plaintiff argues that the HPA violation is closely analogous to common law actions—namely, fraud and breach of contract. First, Plaintiff contends that the HPA violation he is accused of, like the securities violation in <u>Jarkesy</u>, resembles common law fraud. (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 32.) The elements of common law fraud are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." <u>Evaluation Rsch. Corp. v. Alequin</u>, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994). In <u>Jarkesy</u>, the Supreme Court found that the securities fraud cause of action at issue had a "close relationship" with common law fraud because 1) "[b]oth target the same basic conduct: misrepresenting or concealing material facts," 2) Congress used the term "fraud" and "other common law terms of art" when it drafted the federal securities laws, and 3) the Court had "often consider[ed] common law fraud principles when interpreting federal securities law." <u>Jarkesy</u>, 603 U.S. at 125-26. The Court recognized some distinctions between the two, however, including the less stringent burden of proof for securities fraud and that courts have "not typically

- 59 -

interpreted federal securities fraud to require a showing of harm to be actionable by the SEC," but ultimately found the "close relationship" to "confirm[] that this action is 'legal in nature.'" Id. at 126 (citation omitted).

The HPA violation at issue here is distinct from common law fraud. First, unlike Jarkesy, Plaintiff has cited no precedent of either USDA adjudicators or district courts invoking common law fraud principles to interpret and apply the HPA. Second, the language of the act does not use common law fraud terms of art. Third, the elements of the HPA violation overlap minimally with common law fraud. The HPA, unlike common law fraud, does not require any scienter nor require harm to a third-party, only the horse. This is a strict liability regime primarily intended to put an end to what Congress recognized as a "cruel and inhumane" practice. 15 U.S.C. § 1822(1).[17]

_____

[17] Plaintiff argues that the purpose of this Act is to prevent "sore horses from 'compet[ing] unfairly with horses which are not sore.'" (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 32 (quoting 15 U.S.C. § 1822(2)).) However, competition is only one of several purposes of the act; the statute prohibits soring for purposes of competing unfairly, exhibition, sale, or auction. 15 U.S.C. §§ 1822, 1823. Rather, the legislative history of the Horse Protection Act reveals that its primary purpose was to prevent the abuse of horses. See H.R. Rep. 91-1597 ("The reported bill is designed to end the inhumane practice of deliberately making sore the feet of Tennessee walking horses in order to alter their natural gait.").

Plaintiff also argues that the HPA violation alleged against him is analogous to common law breach of contract, because "[e]ntry of a horse into the Virginia show included an agreement by the owner to abide by the rules of competition, which prohibited sore horses." (Pl.'s Resp. in Opp'n & Mem. in Supp. of Summ. J. (Doc. 33) at 32.) The elements of common law breach of contract are "a legally enforceable obligation between the defendant and plaintiff, breached by defendant, which proximately caused damages to the plaintiff." Drs. Co. v. Women's Healthcare Assocs., Inc., 285 Va. 566, 740 S.E.2d 523 (2013). The HPA provision that Plaintiff is alleged to have violated requires a showing that Plaintiff allowed a sore horse to be entered into a horse show. See 15 U.S.C. § 1824(2). The heart of the violation is the fact that the horse was sored; any potential breach of contract associated with that is collateral to the harm that the HPA seeks to address. Plaintiff's attempt to analogize the HPA to a common law breach of contract claim is unpersuasive.

Notably, both common law fraud and breach of contract require some form of damage to a third party. The Horse Protection Act does not address any injury to a third party—a sored horse could have finished in last place in competition, or

a purchaser could have intended to buy a sored horse—yet the penalty would still be applicable in those circumstances.

The Horse Protection Act, like the OSHA cause of action in Atlas Roofing, is a novel regime that brings with it "no common law soil" and was enacted "not to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law." Jarkesy, 603 U.S. at 137. Rather, Congress, in passing the HPA, permitted the USDA to regulate the abuse of horses, a concern foreign to the common law ethos, which saw domestic animals, such as horses, as the "absolute" property of man. See William C. Sprague, Blackstone's Commentaries, Abridged 244 (9th ed. 1915); see also People v. Brunell, 48 How. Pr. 435, 437 (N.Y. Gen. Sess. 1874) ("My opinion is, that at common law, cruelty to an animal merely upon the ground that it gave pain to the animal and for the protection or for the sake of the animal was not indictable.").

Because this cause of action brings "no common law soil," it is analogous to Atlas Roofing and thereby fits within the public rights exception. Accordingly, it may properly be heard before an agency tribunal, notwithstanding any potential application of the Seventh Amendment, and therefore this court need not analyze the parties' arguments regarding the Seventh Amendment. See Granfinanciera, 492 U.S. at 53–54.

## VI.  **CONCLUSION**

This court grants Defendants' motion for summary judgment because there are no disputes of material fact and Defendants are entitled to judgment as a matter of law. Accordingly, Plaintiff's motion for summary judgment will be denied.

First, this court finds that the USDA Judicial Officer holds a position established by law and is "supervised and directed" by a principal officer. Accordingly, his exercise of power conforms with the Appointments Clause. Additionally, because the Secretary of Agriculture has the discretion to completely excise the Judicial Officer from the adjudicative process and herself directly review the ALJ decisions and has the discretion to review the Judicial Officer's decisions, the ALJs are properly supervised inferior officers.

Second, this court finds that the USDA ALJs' dual-layer tenure protection has not inflicted any compensable harm upon Plaintiff and therefore even if the removal protections are unconstitutional, Plaintiff's claim must fail as a matter of law.

Third, this court finds that the HPA provision at issue here falls within the "public rights" exception to Article III adjudication because it is unknown to the common law. Accordingly, agency adjudication does not violate Article III

- 63 -

and the Seventh Amendment poses no independent bar to the adjudication.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), or in the Alternative, for Summary Judgment, (Doc. 26), is **GRANTED** and judgment entered in favor of Defendants dismissing this action as to all claims.

**IT IS FURTHER ORDERED** that Plaintiff's Cross-Motion for Summary Judgment, (Doc. 32), is **DENIED**.

A judgment dismissing this action will be entered contemporaneously herewith.

This the 19th day of August, 2025.

_____
United States District Judge